**NEW ORLEANS STEAMSHIP ASSOCIATION, Plaintiff–Appellant,**

v.

**PLAQUEMINES PORT, HARBOR AND TERMINAL DISTRICT, Defendant–Appellee.**

No. 88–3467.

United States Court of Appeals, Fifth Circuit.

June 9, 1989.

Edward S. Bagley, Terriberry, Carroll & Yancey, New Orleans, La., for plaintiff-appellant.

Louis B. Porterie, Robert E. Fontenelle, Jr., New Orleans, La., for defendant-appellee.

Before WISDOM, GARWOOD, and JOLLY, Circuit Judges.

WISDOM, Circuit Judge:

The question this case presents is whether the Port of Plaquemines Parish may impose charges on ships to finance emergency response services. The New Orleans Steamship Association (NOSA) argues that the Port's charges violate the commerce clause of Article I of the United

States Constitution,[1] the foreign commerce clause,[2] the tonnage clause,[3] the import-export clause,[4] the statute admitting Louisiana to the Union,[5] and the Harbor Development and Navigation Improvement Act of 1986 (HDNI).[6] The district court granted the Port's motion to dismiss NOSA's claims. We hold that ships in the Mississippi River are subject to paying reasonable port fees for services rendered. We affirm.

I

The Port of Plaquemines Parish is the 102–mile narrow stretch of land bordering the Mississippi River from New Orleans to the Gulf of Mexico. Approximately 5,400 oceangoing vessels pass through the Port each year on their way to or from other ports along the River; another 3,876 or so oceangoing vessels dock or anchor in the Port. Unlike most ports, Plaquemines neither owns nor operates wharves, docks, or other facilities; all facilities are privately owned.

By virtue of its police power and an agreement with the United States Coast Guard, the Port has primary responsibility for responding to fires, explosions, and other emergencies that occur within its territory.[7] The Port operates several ships with firefighting and rescue capabilities, a helicopter, land-based pumping units, and a staff to maintain these facilities.[8] It finances these emergency response services with two fees. It assesses a "Harbor Fee" for each day a vessel remains in the Port, moored or at anchor. The fee is determined by the length of the vessel. It is waived for ships detained in the harbor by fog for fewer than 12 hours.[9] The Port also assesses a "Supplemental Harbor Fee" against oceangoing vessels that load or unload cargo in the Port. The fee is 2½ cents per ton for cargo and ½ cent per barrel for liquid cargo.

The parties stipulate that the fees are reasonable.[10] The fees bring the Port ap-

1. The commerce clause gives Congress the power "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

2. *Id.*

3. *Id.* at § 10, cl. 3:
 No State shall, without the Consent of Congress, lay any Duty of Tonnage....

4. *Id.* at cl. 2:
 No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws....

5. 33 U.S.C. § 10 (1982).

6. 33 U.S.C. §§ 2231–2241 (Supp.1988).

7. Memorandum of Understanding Between the Coast Guard and the Plaquemines Parish Commission Council, approved by the Coast Guard, September 4, 1979; Letter from John L. Bailey, Captain, U.S. Coast Guard, to Jim Hoffman, Plaquemines Parish Fire Marshal (June 3, 1983) ("Maintenance of adequate disaster response capabilities for fires, explosions, and other similar incidents is the responsibility of local port operators, municipalities and public agencies.").

8. The Port operates two patrol rescue/firefighting vessels, with a total of twelve crewmen on duty twenty-four hours, plus a full-time maintenance person; a ferryboat with firefighting ca-

pability; mobile pumps; and a 24–hour maritime communications network. In addition, the Parish maintains fire and rescue equipment more powerful than it needs for its own use.

9. The Port contends that it does not charge ships remaining less than one day or those vessels delayed by weather. Because this is before us on the Port's motion to dismiss, we accept NOSA's allegations to the contrary as true.

10. This agreement was reached after years of wrangling. *See Louis Dreyfus Corp. v. Plaquemines Port, Harbor and Terminal Dist.*, No. 78–860 (E.D.La. filed March 15, 1978) (challenging fee announced in 1977), *stayed pending decision by Federal Maritime Commission*, 1980, *dismissed as moot*, 1983; *Louis Dreyfus Corp. v. Plaquemines Port, Harbor and Terminal Dist.*, 21 S.R.R. 219 (I.D.1981), *adopted* 21 S.R.R. 1072 (F.M.C.1982) (invalidating fee announced in 1977). The Port appealed, but the parties settled before the appeal was decided. The Port returned 80% of the fees collected and allowed public comment on a new fee.

 In 1982, the Port announced that fee. It was invalidated. *New Orleans Steamship Ass'n. v. Plaquemines Port, Harbor, and Terminal Dist.*, Docket No. 83–2 (F.M.C. Sept. 16, 1986), *aff'd sub nom. Plaquemines Port, Harbor, and Terminal Dist. v. Federal Maritime Comm'n*, 838 F.2d 536 (D.C.Cir.1988) (Bork, J.). The fees at issue in this case were announced in October 1986. *See infra* note 14.

proximately $1.5 million each year.[11] In 1984, two years before the current fees were announced, the services cost the Port $1,394,369.[12]

The Port announced the fees it now charges in October 1986. NOSA challenged them before the Federal Maritime Commission (FMC), which has authority to ensure that fees charged by nonfederal port authorities are reasonable.[13] The FMC approved the fees but did not address the constitutional or statutory issues NOSA presses before this Court.[14] NOSA filed this suit in federal district court for the Eastern District of Louisiana on June 1, 1987. On June 15, 1988, the district court granted the Port's motion to dismiss.[15] NOSA appeals.

## II

 NOSA argues that the Port has no power to charge harbor fees without Congress's consent. We disagree. State and local fees require congressional consent only if they impede interstate commerce or encroach upon subjects on which Congress has spoken.[16] The Port's fees do neither.

 NOSA misapprehends the relationship between the commerce clause and the Port's fees. The commerce clause prevents state and local regulations that promote parochial interests by discriminating against interstate commerce.[17] When a state or municipality participates in the marketplace, rather than regulating commerce, the commerce clause does not con-

trol its actions.[18] Plaquemines's fees wear the colors of both market regulation and market participation. The Port offers a service and receives payments tied to the costs of providing the service, just as would a private business. This fee-for-service approach is not a regulation, as, for example, would be a rule requiring every ship to provide its own fire fighting and rescue equipment. Neither, however, is the Port acting wholly as a market participant. The emergency response services embody the Port's governmental responsibilities for safety and health; they are not merely a business venture. Further, the Port uses its governmental authority to require payment, and some of the equipment belongs to the Parish's government.

The Supreme Court's decision in *Clyde Mallory Lines v. Alabama*,[19] equips us to evaluate hybrid activities such as the fees. That decision validates a fee levied by the Port of Mobile for police and health services. It holds that: (1) the service funded by the fee must enhance the safety and efficiency of interstate and foreign commerce, ensuring that the fee will not interfere with the purposes of the commerce clause; (2) the fee must be used to pay for the service, reinforcing the assumption of the market participant exception, that the Port will charge what the market would allow; (3) the fee can place at most a small burden on interstate and foreign commerce.[20] Applying this test, courts have consistently held that ships may be made to pay for services

11. Affidavit of H.R. Benvenutti, Port Manager (September 9, 1987). At oral argument, NOSA said that the Port may collect between $1.2 million and $1.8 million each year.

12. Record at 452.

13. 46 U.S.C. §§ 801, 816 (Supp.1988).

14. *See New Orleans Steamship Assn. v. Plaquemines Port, Harbor, and Terminal Dist.,* No. 86-4328 (E.D.La. filed September 29, 1986) (seeking injunction barring Port from collecting fees), *dismissed after FMC approval of new fees,* Jan. 15, 1987, *dismissal aff'd,* 816 F.2d 1074 (5th Cir.1987).

15. 690 F.Supp. 1515. (Ed. A).

16. *Clyde Mallory Lines v. Alabama,* 296 U.S. 261, 267, 56 S.Ct. 194, 196, 80 L.Ed. 215, 219 (1935).

17. *See* The Federalist No. 42, at 267 (J. Madison) (C. Rossiter ed.1961); L. Tribe, *American Constitutional Law* §§ 6.1, 6.3 (2d ed.1988) (describing early interpretations of commerce clause).

18. *White v. Massachusetts Council of Construction Employers,* 460 U.S. 204, 208, 103 S.Ct. 1042, 1044, 75 L.Ed.2d 1, 6 (1983).

19. 296 U.S. 261, 56 S.Ct. 194, 80 L.Ed. 215 (1935).

20. 296 U.S. at 267–68, 56 S.Ct. at 196–97, 80 L.Ed. at 219.

they get.[21]

Plaquemines's fees easily meet the *Clyde Mallory* test. Emergency response services save lives, reduce damage to property, prevent fires from spreading to ships that would not otherwise need the services, and return the Port to full efficiency after an emergency. Second, the parties have stipulated that the fees are reasonable. Finally, the district court found a "dearth of evidence" that Plaquemines's fees burden interstate commerce. The Port has the power to impose the fees.

Although we have concluded that congressional consent is not necessary for approval of the fees, we note that Congress has acquiesced in them. It has created the FMC to regulate port or harbor fees; obviously, it approves of such fees. Most ports levy port or harbor fees, and Congress does not forbid them. Admittedly, congressional silence is an unstable foundation on which to base a finding of acquiescence.[22] Fees charged by local ports in this country, however, have been upheld by the courts since the 19th Century; it is hard to impute ignorance against that background. Indeed, Congress has shown that it knows how to regulate port fees. The tonnage clause requires that states obtain the consent of Congress before financing harbor improvements by means of port or harbor fees; the Harbor Development and Navigation Improvement Act of 1986 (HDNI) allows fees for that purpose.[23]

## III

### A. *The Dormant Commerce Clause*

■ NOSA argues that, even if Congress has acquiesced, it has not consented clearly enough to satisfy the so-called "dormant commerce clause". In *South Central Timber Development v. Wunnicke,* the Supreme Court announced that Congress must consent expressly and affirmatively to state or local actions that "impos[e] substantial burdens" on interstate or foreign commerce.[24] We need not decide whether Congress has expressly consented, because the prerequisite for applying dormant commerce clause doctrines does not hold here. The Port's fees have not been proved to impose "substantial" burdens on interstate and foreign commerce.

### B. *The Foreign Commerce Clause*

■ In *Japan Line v. Los Angeles,* the Supreme Court announced that state and local policies affecting foreign commerce are invalid if they (1) create a substantial risk of conflicts with foreign governments; or (2) undermine the ability of the federal government to "speak with one voice" in regulating commercial affairs with foreign states.[25]

NOSA does not argue that the fees cause conflicts with foreign sovereigns.[26] Port fees for services are "routinely employed

---

21. *See id.,* 296 U.S. at 268, 56 S.Ct. at 197, 80 L.Ed. at 219 (listing cases); *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 319–20, 13 L.Ed. 996 (1851) (local ports may charge for pilotage); *Indiana Port Comm'n v. Bethlehem Steel Corp.,* 534 F.Supp. 858 (N.D.Ind.1981); *Vincent v. Foss & Crabtree,* 118 Fla. 717, 160 So. 49, 52 (S.Ct. Div. B 1935).

22. *See* W. Eskridge & P. Frickey, *Legislation: Statutes and the Creation of Public Policy* 772–74 (1988) (congressional inaction ambiguous).

23. *See* 36 U.S.C. § 2236(a)(1) (Supp.1988) (consenting to fees for harbor improvements). The tonnage clause, *supra* note 3, was passed in its present form after the Constitutional Convention rejected an amendment proposed by Maryland. That amendment provided that "no state shall be restrained from laying duties of tonnage for the purpose of *clearing harbors* and erecting light-houses." 2 *Records of the Federal Convention of 1787,* at 625 (M. Farrand ed.1966)

(emphasis added). The Convention rejected the amendment on Madison's recommendation that duties of tonnage for those purposes should be left to Congress. *Id.* In other words, the legislative history suggests strongly that congressional consent to port fees "for the purpose of" harbor improvements is required; that requirement is not apparent in the history of fees for services rendered.

24. 467 U.S. 82, 91–2, 104 S.Ct. 2237, 2242, 81 L.Ed.2d 71, 79 (1984).

25. 441 U.S. 434, 446, 99 S.Ct. 1813, 1820, 60 L.Ed.2d 336, 346 (1979).

26. This is in direct contrast to the facts of *Japan Line.* Japan and California had already clashed over the taxation of the containers. 441 U.S. at 451, 99 S.Ct. at 1823, 60 L.Ed.2d at 349.

by most port nations".[27] This suggests that nations do not foresee conflicts arising from reasonable fees, a fact which removes them from our purview.[28]

Second, local fees do not fragment the federal government's voice. In the Harbor Development and Navigation Act of 1986, Congress explicitly authorizes local ports to impose port or harbor fees.[29] "Most port nations" allow local fees.[30] Further, Congress has insured that the voice of the United States will be as unified as necessary. It has appointed the FMC to regulate fees imposed by local ports.[31] Admittedly, the power to invalidate a fee on constitutional or foreign policy grounds is not in the FMC's statutory mandate.[32] It can, however, require that fees imposed by nonfederal authorities are reasonable. Because port fees are common in international trade, they are part of the backdrop against which foreign affairs is played; reasonable ones are not likely to hamper the federal government's power to conduct foreign relations. If one ever does, Congress may ban it.[33]

### C. The Tonnage Clause

■ The tonnage clause prohibits any state or local duty imposed on tonnage "without the Consent of Congress". Because we have held that Congress has consented to fees for the services rendered, we do not apply the tonnage clause. Nevertheless, we note that the Port's fees do not fall within the clause's prohibition. The clause prohibits reliance on tonnage duties to raise general revenues, to regulate trade, or to charge for the privilege of entering, lying in, or trading in a port.[34] Ships entering Plaquemines Port pay a fee to insure that emergency services will be available; this is a transaction, not a revenue device, a regulation or a payment simply to use the Port. *Clyde Mallory* holds that fees for "services rendered to and enjoyed by the vessel" pass muster under the tonnage clause.[35] Here, as there, not every ship paying the fee needs the service; they have paid for the assurance of its availability. In an appeal from an FMC decision on a fee earlier proposed by the Port, the Court of Appeals for the District of Columbia followed *Clyde Mallory* and held that the Port's fee did not violate the tonnage clause.[36] For the reasons just stated, we agree.

### D. The Import–Export Clause

■ The Supreme Court has concluded twice in recent years that a fee for "services, such as fire or police protection, supplied by the local government" is not an "impost or duty" proscribed by the import-export clause.[37] The Port charges for protection from emergencies. Its fees, therefore, do not violate the import-export clause.

27. H.Rep. No. 99–251 pt. 4, 99th Cong., 2nd Sess. 21 (1985).

28. *See Japan Line,* 441 U.S. at 455 n. 20, 99 S.Ct. at 1825 n. 20, 60 L.Ed.2d at 352 n. 20 (speculative conflicts do not implicate foreign commerce clause); *Container Corp. of America v. Franchise Tax Board,* 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (same).

29. 36 U.S.C. § 2236(a)(1)(B) (Supp.1988).

30. *See* H.Rep. No. 99–251 pt. 4, *supra* note 27, at 21.

31. 46 U.S.C. §§ 801, 816 (Supp.1988).

32. *See id.*

33. *See Gloucester Ferry Co. v. Pennsylvania,* 114 U.S. 196, 215, 5 S.Ct. 826, 834, 29 L.Ed. 158, 166 (1885) (courts need not fear state action as long

as "the power to arrest collision" with federal policies "resides in the National Congress").

34. *Clyde Mallory,* 296 U.S. at 265–66, 56 S.Ct. at 195, 80 L.Ed. at 218.

35. *Id.* at 267, 56 S.Ct. at 196, 80 L.Ed. at 219.

36. *Plaquemines,* 838 F.2d at 546.

37. *Washington Revenue Dept. v. Stevedoring Ass'n,* 435 U.S. 734, 753, 98 S.Ct. 1388, 1401, 55 L.Ed.2d 682, 699 (1978); *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 287, 96 S.Ct. 535, 46 L.Ed.2d 495, 504 (1976). *Washington Revenue Department* and *Michelin* concerned state taxes on items in international commerce. The Court had to decide whether the amount of tax reflected actual costs incurred by the state. This difficult calculation is not necessary in the case before us, because the parties agree that the fee is reasonable.

### E. *33 U.S.C. § 10*

 NOSA argues that the Port's fees violate the statute admitting Louisiana to the United States. The statute reads:

All the navigable rivers and waters of the former Territories of Orleans and Louisiana shall be and forever remain public highways.[38]

Congress declared at the time Louisiana was admitted to the Union that the "river Mississippi and the navigable rivers and waters leading into the same and into the Gulf of Mexico, shall be common highways ...without any tax, duty, impost or toll therefore, imposed by said State".[39] These declarations proscribe fees for the mere privilege of navigating through waters, or imposts that create preferences for certain private parties over others.[40] The Port charges for services, not for privileges. Its fees create no privileges. Courts have consistently distinguished fees for services from the tolls or imposts prohibited by statutes similar to 33 U.S.C. § 10.[41]

### F. *The Harbor Development & Navigation Improvement Act*

Cutting through all the chaff, we come finally to what we consider is NOSA's primary argument: its interpretation of Section 2236 of the Harbor Development and Navigation Improvement Act of 1986 (HDNI).[42] Section 2236(a)(2) of the HDNI expressly allows a port to levy charges to finance emergency response services,[43] when the port is financing a harbor improvement project.[44] Plaquemines is not financing a harbor improvement.

To infer that the Port's fees violate the HDNI, we must find evidence that Congress intended its express consent to fees for emergency response services in conjunction with harbor improvement projects to imply disapproval of those fees imposed absent projects.[45] We do not find that evidence. Instead, we conclude that the HDNI applies when a port has undertaken a harbor improvement project and not otherwise.

### 1. The HDNI's Legislative History and Language

By the mid–1980's, many American ports and harbors could not accomodate new, large and efficient ships. Improvements in harbors and ports relied on federal initiative and funding. Every project underwent

---

**38.** 33 U.S.C. § 10.

**39.** 2 Stat. at Large 703 (1812).

**40.** *Hamilton v. Vicksburg, S. & P.R., Co.,* 119 U.S. 280, 285, 7 S.Ct. 206, 208, 30 L.Ed. 393, 395 (1885) (interpreting 33 U.S.C. § 10).

**41.** *See Huse v. Glover,* 119 U.S. 543, 7 S.Ct. 313, 30 L.Ed. 487 (1886) (upholding fees charged for use of locks built on navigable waters under similar statute); *Indiana Port Commission,* 534 F.Supp. at 864–65.

**42.** Section 2236 provides, in relevant part:
(a) Consent of Congress
 Subject to the following conditions, a non-Federal interest may levy port or harbor dues (in the form of tonnage duties or fees) on a vessel engaged in trade entering or departing from a harbor and on cargo loaded on or unloaded from that vessel under clauses 2 and 3 of section 10, and under clause 3 of section 8, of Article 1 of the Constitution:
(1) Purposes
 Port or harbor dues may be levied only in conjunction with a harbor navigation project whose construction is complete (including a usable increment of the project) and for the following purposes and in amounts not to exceed those necessary to carry out those purposes:
 (A)(i) to finance the non-Federal share of construction and operation and maintenance costs of a navigation project for a harbor under the requirements of section 2211 of this title; or
 (ii) to finance the cost of construction and operation and maintenance of a navigation project for a harbor under section 2232 or 2233[sic] of this title; and
 (B) provide emergency response services in the harbor, including contingency planning, necessary personnel training, and the procurement of equipment and facilities.
(2) Limitations on port or harbor dues for emergency service
 Port or harbor dues may not be levied for the purposes described in paragraph (1)(B) of this subsection after the dues cease to be levied for the purposes described in paragraph (1)(A) of this subsection.

**43.** *Id.* at § 2236(a)(1)(B).

**44.** *Id.* at § 2236(a)(2).

**45.** 2A Sutherland Stat. Constr. § 47.25, at 209 (1984).

nineteen independent reviews,[46] with an average of twenty-six years passing between the first study of a project and the project's completion.[47] No new project was authorized between 1970 until shortly before passage of the HDNI.[48] Federal spending on harbor construction declined 78% after the 1960's; mounting pressures on the federal budget made increased appropriations for projects unlikely.[49]

The HDNI authorizes nonfederal ports to help plan projects initiated by the federal government,[50] to initiate projects to be built by the federal government,[51] and to build projects themselves.[52] The HDNI also requires nonfederal ports to pay part of the costs of improving harbors and ports.[53] Congress intends local involvement in planning and building to speed harbor improvements. Port fees levied for purposes other than harbor improvements do not threaten accomplishment of this aim. There is therefore no conflict between the fees and the Act invalidating certain fees.[54]

▮▮▮▮ Section 2236 sits in a subchapter entitled "Harbor Development". Every section in that subchapter discusses harbor improvements.[55] The organization of the statute is not dispositive, of course. None-theless, it suggests strongly that Congress intended to limit its discussion of nonfederal fees to those financing harbor improvements. Senator Abdnor said that the first Senate bill to authorize local port fees "applies only to those ports where a new channel improvement would be put in place." [56] Senator Abdnor was the sponsor and a principal advocate for the HDNI; his comments deserve great weight.[57] We conclude that the HDNI is designed to improve the planning and financing of harbor improvements; it does not address ports' long-standing authority to levy fees for emergency response services.

### 2. The Play of the HDNI and Congress's Beliefs About the Power of Nonfederal Ports to Impose Fees

The language of the HDNI appears to forbid all port fees except those to which Congress has expressly consented. Nevertheless, we conclude that Section 2236(a)(2) is the solution to a puzzle Congress set for itself—and understood.

The puzzle starts with the idea that Congress believed nonfederal ports could charge only ships that benefitted directly from port services. The House Report noted:

the Saint Lawrence Seaway. Section 2235 authorizes construction in increments. Section 2238 authorizes appropriations for improvements. Section 2239 regulates sites for dumping material dredged during improvements. Section 2240 authorizes grants for emergency response services to nonfederal ports "operating a harbor improvement project". It is discussed in note 63, *infra*. Section 2241 defines terms necessary for governing harbor improvements.

The lone, partial exception is Section 2237. It requires nonfederal ports to provide information necessary for national security. Although it does not mention harbor improvements, it is in no way inconsistent with our conclusion that the entire subchapter applies only when harbor improvements are under construction.

**46.** H.Rep. No. 99–251 pt. 4, *supra* note 27, at 17.

**47.** S.Rep. No. 99–126, 99th Cong. 2d Sess. 3, *reprinted in* 1986 U.S.Code Cong. & Admin. News 6639, 6640.

**48.** H.Rep. No. 99–251 pt. 4, *supra* note 27, at 17.

**49.** S.Rep. No. 99–126, *supra* note 47, at 3; H.Rep. No. 99–251 pt. 4, *supra* note 27, at 16.

**50.** 33 U.S.C. §§ 2215, 2233 (Supp.1988).

**51.** *Id.* at § 2231.

**52.** *Id.* at § 2232.

**53.** *Id.* at §§ 2211(a), 2218. *See* S.Rep. No. 99–126, *supra* note 47, at 51 (cost-sharing is "heart" of HDNI).

**54.** *See Jones v. Rath Packing,* 430 U.S. 519, 525–26, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604, 614 (1977) (statute should be interpreted as not forbidding acts that do not conflict with its purpose).

**55.** Section 2231 regulates planning. Sections 2232 and 2233 coordinate state and federal involvement. Section 2234 exempts projects on

**56.** Water Resources Development Act: Hearings on S. 1567 Before the Subcomm. on Taxation and Debt Management of the Senate Comm. on Finance, 98th Cong., 2d Sess. 222 (1984) (statement of Senator Abdnor).

**57.** *See* Eskridge and Frickey, *Legislation, supra* note 22, at 735 (problems with legislative history "disappear" when sponsor speaks).

In the case of *Clyde Mallory Lines v. United States [Alabama]*, 296 U.S. 261 [56 S.Ct. 194, 80 L.Ed. 215] (1935), the Supreme Court reaffirmed the limitation on the authority of dock ports to levey [sic] fees to direct services, including wharfage, dockage, pilotage, stevedoring, and demurrage.... [58]

Section 2236 is built around this belief. Section 2236(a)(1) forbids fees to finance harbor improvements until after the project is complete. Obviously, this prevents non-federal ports from fraudulently charging for projects that are mere speculation or that suffer from undue delays while under construction. More to the point, it ensures that the fees will be paid by ships that benefit directly from improvements, as the Senate Report noted:

> [The HDNI] permits non-Federal public interests to collect user fees to reimburse themselves for a newly required non-Federal share of the cost.
>
> ...
>
> The taxes and fees in this legislation are not for the purpose of raising revenue. Rather, they are to repay costs related directly to the servicing of commerce. These fees and taxes offset services rendered to vessels. The provision of a new, deeper channel is as much a service rendered to the shipper as pilotage, dockage, or wharfage.[59]

This framework leaves fees to finance emergency response services in an odd position, however. Nonfederal ports must continue to provide emergency response services while a project is under construction. Yet Section 2236(a) prohibits ports from charging for those services "in conjunction with" a project that is under construction; at the least, the section prohibits ports from charging ships for any additional response services made necessary by construction.[60] Ports therefore suffer some financial hardship during construction. Unfortunately, they could not make up the shortfall by charging after construction's complete; the ships paying the fee after construction is complete will not have benefitted directly from the services, because the service is offered during construction. Ports need the consent of Congress to charge for the shortfall. Congress consented to these retroactive fees but limited them to the time the ships are also paying for the improvement itself. In this way the ships that directly benefit from the completed project pay not only for the cost of building the project but also for the ancillary cost of emergency services while it is under construction.

Section 2240 supports our reading. It allows nonfederal ports "operating a [harbor improvement] project" to receive a grant "for the provision of emergency response services".[61] The inclusion of this section indicates that Congress was aware that Section 2236 limited funding for emergency response services. Section 2240 authorizes only $5,000,000 for these grants from fiscal years 1987–1991.[62] Emergency response services cost much more; for example, the Port of Plaquemines spends

---

**58.** H.Rep. No. 99–251, pt. 4, *supra* note 27, at 21. We do not necessarily agree that *Clyde Mallory* distinguishes fees from direct services from those for indirect services. Our purpose here, however, is to attempt to understand what Congress believed.

**59.** S.Rep. No. 99–126, *supra* note 47, at 7, 1986 U.S.Code Cong. & Admin.News 6644.

**60.** In this case we need not decide whether ports may continue to charge their usual fees for emergency response services while a harbor improvement project is underway. Nor do we decide whether fees for such new or additional post-completion emergency response services as may have been made needful by reason of the covered project's completion are subject to the limitation of section 2236(a)(2).

**61.** Section 2240(a) reads:

> The Secretary is authorized to make grants to any non-Federal interest operating a project for a harbor for provision of emergency response services in such harbor (including contingency planning, necessary personnel training, and the procurement of equipment and facilities either by the non-Federal interest, by a local agency or municipality, or by a combination of local agencies or municipalities on a cost-reimbursable basis, either by a cooperative agreement, mutual aid plan, or mutual assistance plan entered into between one or more non-Federal interests, public agencies, or local municipalities).

**62.** *Id.* at 2240(b).

nearly $1.5 million annually. The discrepancy suggests that Congress saw the HDNI as affecting only a portion of the funding for emergency response services. That portion is the funding for services offered "in conjunction with" a harbor project.[63]

Our interpretation receives further support from the kinds of fees not mentioned in Section 2236. Fees for other services, such as wharfage and pilotage, attach to individual ships; they are not "port or harbor dues" governed by Section 2236.[64] Section 2211, which outlines cost-sharing obligations for projects built by the federal government, requires nonfederal ports to provide lands, easements, rights-of-way, relocations, and dredged material disposal sites;[65] the federal government credits these expenses toward other cost-sharing obligations,[66] thereby subsidizing them. As we concluded, Section 2236(a)(1)(B) allows the marketplace to pay the only fees not discussed in Section 2211; Section 2240 provides a governmental subsidy for any shortfalls.

### IV

If ships receive a service they pay for, fees charged by a nonfederal port authority are constitutional. NOSA's attacks based on the dormant and foreign commerce clauses, on the tonnage clause, on the import-export clause, and on the statute admitting Louisiana to the Union fail on this principle.

The HDNI forbids ports from charging for emergency response services "in conjunction with" harbor improvement projects until after the projects are completed. The Act explicitly authorizes nonfederal ports to recoup those costs by charging after the harbor improvement is finished. This explicit permission does not establish that Congress intended to deny nonfederal ports the authority to impose fees for services performed when no covered harbor improvement project has been undertaken. The decision of the district court is AFFIRMED.

---

**63.** We recognize that the phrase "grants to any non-Federal interest operating a project for a harbor for provision of emergency response services" is not entirely clear. *See supra* note 60. We interpret it as authorizing "grants ... for the provision of emergency response services" to "any non-Federal interest operating a [harbor improvement] project". It might mean to authorize grants to finance "a project ... for provision of emergency response services". On this reading, Section 2240 permits grants to any nonfederal port providing emergency response services. The second reading does not distinguish between ports with projects and those without; the rest of the legislation makes such a distinction. Every other time the HDNI mentions "operating a project" it means a harbor improvement program, not a project already operated by nonfederal ports (as emergency services are). *See e.g.,* Section 2241(2)(A) (defining "opera-

tions"). Most importantly, Section 2240(b) appropriates $5,000,000 for these grants over six fiscal years. The cost to operate emergency response services in Plaquemines Parish alone is $1.5 million.

**64.** *See supra* accompanying note 58.

**65.** 33 U.S.C. § 2211(a)(3).

**66.** *Id.* at 2211(a)(2). Section 2211(a)(1) requires that nonfederal ports pay 10% of the construction costs of the portion of the project which has a depth not in excess of 20 feet; plus 25% of costs between 20 and 45 feet; plus 50% of costs in excess of 45 feet. Section 2211(a)(2) requires payment of an additional 10% over 30 years. It credits expenses incurred under paragraph (a)(3) to that 10% obligation.