# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 14, 2022

Lyle W. Cayce
Clerk

No. 22-40158

BG Gulf Coast LNG, L.L.C.; Phillips 66 Company,

*Plaintiffs—Appellants*,

*versus*

Sabine–Neches Navigation District of Jefferson
County, Texas,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 1:21-CV-470

Before Stewart, Elrod, and Graves, *Circuit Judges*.

Jennifer Walker Elrod, *Circuit Judge*:

The Sabine–Neches Waterway is located in the southeastern-most parts of Texas and the southwestern-most parts of Louisiana, providing passage from the Gulf of Mexico to Port Arthur, Beaumont, and Orange, Texas, and beyond. It is vitally important to the local, state, and federal economies. Despite its importance, sixty years have gone by without much effort to maintain or otherwise improve it. The Sabine–Neches Navigation District set out to change that. The price tag on the proposed improvements totaled roughly $1.1 billion. After some bureaucratic wrangling, Congress

No. 22-40158

covered most of the cost with the District left to cover the rest.  The District planned to cover its share through port fees.  But the same federal law that led to congressional funding also sets limits on how costs can be passed onto consumers by local entities.  Two energy companies sued the District, claiming that the port fees exceeded those limits.  The district court concluded that they failed to state plausible claims and dismissed the case.  We AFFIRM.

I.

As waterways here in America go, the Sabine–Neches Waterway is one of our nation's most critical.  Not only does it rank near the top in business and busyness, it is home to the U.S. military's largest strategic commercial seaport.  But as ships became larger, the Sabine–Neches Waterway largely stayed the same.  Its lack of depth and width poses a problem for many modern vessels.

To make the necessary improvements to the Waterway, the District needed funds.  Congress opened up the federal purse for such projects through the Water Resources Development Act of 1986, 33 U.S.C. § 2201, *et seq.*  In the years before the Act's passage, trying to improve waterways was a bureaucratic nightmare.  *See New Orleans S.S. Ass'n v. Plaquemines Port, Harbor & Terminal Dist.*, 874 F.2d 1018, 1024–25 (5th Cir. 1989) (digesting the backstory of the Harbor Development and Navigation Improvement Act, which was passed as part of the Water Resources Development Act).  It could take up to twenty-six years from first study to project completion, with as many as nineteen independent reviews along the way.  *Id.*  When Congress passed and President Reagan signed the Act, Congress had not approved a project in nearly two decades.  *Id.*  Through the Act, Congress streamlined the process and came up with a new way to finance waterway-construction and -improvement projects.  *Id.* at 1025.  Rather than rely only on the federal

fisc, the federal government would shoulder some or most of the cost and would share the rest with state and local entities. *Id.* Plus, state and local entities had a greater practical interest in the waterway development, so they were more likely to get it done faster. *Id.*

The process begins with a feasibility study by the U.S. Army Corps of Engineers. Once that is done, it is published in the Federal Register and the Secretary of the Army gives it to Congress. Congress then reviews the study and the projected costs and puts it to a vote. If it prevails and the President signs it, Congress gives the local entities money to cover the first phase of the project (called "new start" funds). The local entities then enter into a cooperative agreement with the Army Corps of Engineers covering the project, which includes "provid[ing] to the Federal Government the non-Federal share of all other costs of construction of [the] project." 33 U.S.C. § 2211(e)(3). *See also Air Liquid Am. Corp. v. U.S. Corps of Engineers*, 359 F.3d 358, 361 (5th Cir. 2004) (describing process).

The District prepared for years, but did not formally begin the Sabine–Neches Waterway Channel Improvement Project until 2011. The District worked with the Army Corps of Engineers, and the Corps completed its study in March of that year. The Corps concluded that Congress should fund the Project: deeper waterways means bigger ships which fit more cargo, which means fewer ships, which means less congestion. The Secretary of the Army transferred the Project to Congress, Congress passed it, *see* Water Resources Reform and Development Act of 2014, Pub. L. No. 113–121, 128 Stat. 1193, 1364, § 7002 (2014) ("WRDA-14"),[1] and President Obama signed

---

[1] Because each new project that goes through this process requires an act of Congress (literally), the parties refer to each new act as "WRDA" followed by a two-digit year, *e.g.*, "WRDA-14." They also refer to the 1986 Act (detailed above) as "WRDA-86."

it into law.[2]  The Project's price tag was just over $1.1 billion, with the federal government covering around $748 million and the District just under $366 million.  *Id.*  Congress then appropriated "new start" funds for the Project to get the ball rolling in 2019.  *See* Energy and Water, Legislative Branch, and Military Construction and Veterans Affairs Appropriations Act, 2019, Pub. L. No. 115–244, 132 Stat. 2897, 2898–99 (2019).  Those new-start funds would ultimately be used to complete the first part of the Project: the deepening of Anchorage Basin No. 1 from twenty feet to forty feet.

The District and the Corps then entered into the statutorily required agreement.  *See* 33 U.S.C. § 2211(e)(3).  The Agreement listed the projected cost at over $1.2 billion (up a bit from WRDA-14), with a $732 million/$488 million federal–District split (roughly 60%–40%).  That number, of course, was a projection, and its fluidity becomes relevant later.  The Agreement otherwise detailed the specifics on the deepening and widening of the Waterway and outlined the environmental effects of the Project.[3]

---

For ease of reference, we refer to the 1986 Act as "the Act" and otherwise refer to any other project-approval act as "WRDA-##."

[2] *See* David Hudson, *President Obama Signs the Water Resources Reform and Development Act, and Honors the "Borinqueneers,"* The White House (June 10, 2014), https://obamawhitehouse.archives.gov/blog/2014/06/10/president-obama-signs-water-resources-reform-and-development-act-and-honors-borinque.

[3] "[D]eepening the Sabine Neches Waterway (SNWW) from 40 to 48 feet and the offshore channel from 42 to 50 feet in depth from offshore to the Port of Beaumont Turning Basin; extending the 50-foot deep offshore channel by approximately 13.2 miles to deep water in the Gulf, increasing the total length of the channel from approximately 64 to 77 miles; tapering and marking the Sabine Bank Channel from 800 feet wide to 700 feet wide; deepening and widening the Taylor Bayou channels and turning basins; easing selected bends on the Sabine-Neches Canal and Neches River Channel; constructing new and enlarging/deepening existing turning and anchorage basins on the Neches River Channel; beneficial use of dredged material features consisting of the restoration of 2,853 acres of emergent marsh, improvement of 871 acres of shallow water habitat, and nourishment of 1,234 acres of existing marsh in Texas; mitigation measures consisting of the restoration of

So the District needed $488 million.  The first $20 million in "new start" funds went to deepening Anchorage Basin No. 1—before it was twenty-feet deep, now it is forty-feet deep.  Once that was done, the District proposed the User Fee.  The User Fee would apply only to ships with drafts greater than twenty feet—in other words, ships that were too big to use the Basin before the deepening.  The Fee could change based on certain (unrelated) conditions, but the basics are as follows:

|  | hydrocarbon cargo | non-hydrocarbon cargo |
|---|---|---|
| *minimum* | $0.00 per short ton | $0.00 per short ton |
| *starting rate* | $0.20 per short ton | $0.02 per short ton |
| *maximum* | $0.35 per short ton | $0.035 per short ton |

Every short ton loaded onto a ship or unloaded from a ship is charged.[4] Key for our purposes, the ordinance says that the District would collect the Fee until the first of either (a) all construction costs are repaid, or (b) January 1, 2049.

Per the Act, the District published the proposed ordinance in the Federal Register and received public comment.  86 Fed. Reg. 7369-05 (Jan. 28, 2021).[5]  After a hearing, the Commissioners of the District passed the

---

2,783 acres of emergent marsh, improvement of 957 acres of shallow water habitat, and stabilization and nourishment of 4,355 acres of existing marsh; and post-construction monitoring and adaptive management of the beneficial use features and mitigation areas[.]"

[4] A "ton" in America and Canada is 2,000 lbs., while a "ton" in the United Kingdom is 2,240 lbs.  To avoid confusion, "short ton" is used for something that is 2,000 lbs. and "long ton" for 2,240 lbs.

[5] The District actually went through notice and comment twice.  The first proposed ordinance set a flat $0.35/short ton for hydrocarbon cargo and no fee at all for the non-hydrocarbon cargo.  85 Fed. Reg. 37,634, 37,635 (June 23, 2020).  After a hearing and talking with the Corps, the District revised the ordinance to what it is today. *Id.*

No. 22-40158

Ordinance, and the District began levying the fee against the bigger ships on May 1, 2021.

BG Gulf Coast LNG and Phillips 66 Company are energy companies. BG Gulf Coast has already paid well into the six figures because of the Ordinance. As of the filing of the Complaint, Phillips 66 had not yet sent any of its cargo on bigger ships. But it planned to. They both sued, alleging that the Ordinance violated several provisions of the Act. The District moved to dismiss under Rule 12(b)(6). The district court granted the motion on each claim, concluding that the District satisfied all of the requirements of the Act, including the requirement that any fees must be imposed "on a fair and equitable basis."[6] The district court then dismissed the case with prejudice. The energy companies (hereinafter "BG Gulf Coast") appealed. We subsequently granted the District's motion to expedite the appeal.

## II.

We review *de novo* the grant of a motion to dismiss under Rule 12(b)(6). *Residents of Gordon Plaza, Inc. v. Cantrell*, 25 F.4th 288, 295 (5th Cir. 2022). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

---

[6] Dictionaries at the time the Act was passed defined "fair" as "[h]aving the qualities of impartiality and honesty; free from prejudice, favoritism, and self-interest," *Fair*, Black's Law Dictionary 534 (5th ed. 1979), and "equitable" as "[j]ust; conformable to the principles of justice and right," *Equitable*, Black's Law Dictionary 482 (5th ed. 1979). *See also* Webster's Third New International Dictionary 815 (1971) ("equitable" means "characterized by equity"). The most recent edition of Black's Law Dictionary includes this example for the term "fair": "everyone thought Judge Reavley to be fair." *Fair*, Black's Law Dictionary 715 (11th ed. 2019).

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* We accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Id.* But we do not presume that a complaint's legal conclusions are true, no matter how well they are pleaded. *Id.*

## A.

Section 2236 of the Act sets limits on (among other things) how and when a non-federal interest can pass costs onto consumers vis-à-vis "[p]ort or harbor dues." One such condition is in § 2236(a)(1): "Port or harbor dues may be levied only in conjunction with a harbor navigation project whose construction is complete (including a usable increment of the project)[.]"

To BG Gulf Coast, this means that the District can only impose a fee for either (a) its share of the entire $1.1 billion project once it is completed, or (b) its share of a "usable increment" of the Project, provided that the fee is imposed for use of that usable increment. Put another way, the District cannot impose the User Fee on vessels and cargo because of Anchorage Basin No. 1 to pay for any other part of the project, let alone (as the Ordinance says) the District's entire share of the project. According to BG Gulf Coast, this follows textually from the words "in conjunction with" in subsection (a)(1). As well as by contextual inference from other parts of § 2236 in which Congress only allows fees for incurred costs, not speculative future costs. BG Gulf Coast finds some further support in certain language from *Plaquemines*, language which, it says, makes this an open-and-shut issue. *See* 874 F.3d at 1025.

The District says that BG Gulf Coast's reading of the statute stops too soon; the full condition reads: "in conjunction with a harbor navigation project whose construction is complete (including a usable increment of the project) and for the following purposes and in amounts not to exceed those

necessary to carry out those purposes: (A)(i) to finance the non-Federal share of construction and operation and maintenance costs of a navigation project for a harbor under the requirements of [33 U.S.C. § 2211]." § 2236(a)(1). According to the District, this means that once a usable increment of the project is done, it may then "finance" its "share of construction and operation and maintenance costs of" the Project. In contrast to BG Gulf Coast's reading—which requires the non-federal interest to build first and pay later—this allows for the process under the Act to work like this: (1) Congress funds the first phase of the project; (2) the non-federal interest, after going through notice and comment, imposes a fee to build revenue to cover its share; (3) the fee raises funds to pay for the next increment of the project; and (4) so on until the project is complete.

The district court agreed with the District. It concluded that BG Gulf Coast's approach was atextual, as it required reading that parenthetical "(including a usable increment of the project)" out of the statute. BG Gulf Coast's way around the parenthetical was to say that "harbor navigation project" in (a)(1) must mean the same thing as "navigation project for a harbor" under (a)(1)(A)(i), and thus a fee for "a usable increment of the project" in (a)(1) meant that a fee could only finance the same "usable increment." The district court concluded that, no, "a usable increment of the project" defines what it means for a project to be "complete," not what it means to be a harbor navigation project. As for *Plaquemines*, the district court concluded that it did not apply as it was purely about subsection (a)(2) and emergency-service fees.

We agree with the district court. BG Gulf Coast's interpretation of "in conjunction with" is far too cramped. To be sure, "conjunction" was defined at the time as a "simultaneous occurrence in space or time." *Conjunction*, American Heritage Dictionary 311 (2d College ed. 1982). BG Gulf Coast says that the User Fee is being levied "in conjunction with" the

District's "*plan* to construct the Project's remaining increments at some future date." But that argument fails because subsection (a)(1) allows fees for projects "whose construction is complete (including a usable increment of the project)." It also says that other subsections, like (a)(3)(B), contemplate using fees for "project features *constructed* under this subchapter," which shows that fees are only for "incurred costs." But subsection (a)(1) refers to "usable increment[s]," not "project features," and it has no similar past-tense "constructed" language. *See Christiana Tr. v. Riddle*, 911 F.3d 799, 805 (5th Cir. 2018) ("When Congress includes particular language in one section of a statute but omits it in another, we presume[] that Congress intended a difference in meaning." (quotation omitted)). So if anything, that cuts against its argument because Congress presumptively treated "usable increments" of projects differently than "project features," and thus fees are allowed under different circumstances and require consideration of completely different factors.

BG Gulf Coast again tries to tie fees to the specific "usable increment of the project," so that fees may only be used after-the-fact to pay for that increment. But to do so, it has to argue that "(including a usable increment of the project)" modifies "a harbor navigation project," so that later when subsection (a)(1)(A)(i) says "a navigation project for a harbor," it means "a usable increment of the project." But it makes far more sense that this language means that once a usable increment of the project is complete, a fee may be levied, not that a fee may only be levied to finance a usable increment of the project. *Cf.* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 152–53 (2012) (the Nearest-Reasonable-Referent canon: "When the syntax involves something other than a parallel series of nouns or verbs, a prepositive or postpositive modifier normally applies only to the nearest reasonable referent.").

At first blush, some language in *Plaquemines* supports BG Gulf Coast, but that case concerned an entirely different provision of the Act. *Knight v. Kirby Offshore Marine Pac., L.L.C.*, 983 F.3d 172, 177 (5th Cir. 2020) ("A statement is dictum if it could have been deleted without seriously impairing the analytical foundations of the holding and[,] being peripheral, may not have received the full and careful consideration of the court that uttered it." (quoting *United States v. Segura*, 747 F.3d 323, 328–29 (5th Cir. 2014))). *Plaquemines* described § 2236(a)(1) as "forbid[ing] fees to finance harbor improvements until after the project is complete," but that case was actually about subsection (a)(2), and how the Act does not otherwise constrain a port's ability to assess a fee until a port "has undertaken a harbor improvement project." 874 F.2d at 1026, 1024–25. So *Plaquemines* is only relevant to the extent it holds that the Act applies once a project *begins*, not when it *ends*, and the fact that subsection (a)(1) was in no way raised or relevant to the bottom-line conclusion is dispositive. *See Knight*, 983 F.3d at 178 (dicta is "peripheral" and "may not have received [our] careful consideration").

BG Gulf Coast's theory of subsection (a)(1) fails at every turn. The statute, properly construed, allows the District to finance its share of the project once a usable increment of the project is completed. Because Anchorage Basin No. 1 has been completed, subsection (a)(1) permitted the District to pass the Ordinance containing the User Fee.

### B.

As discussed, upon completion of a usable increment of the project, § 2236(a)(1)(A)(i) allows a non-federal interest to levy a harbor fee "in amounts not to exceed those necessary to carry out" the following purpose: "to finance the non-Federal share of construction and operation and maintenance costs of a navigation project for a harbor under the requirements

of [33 U.S.C. § 2211].'' Section 2211(a)(1)(B) says that the non-federal interest ''shall pay, during the period of construction of the project,'' 25% ''of the cost of construction of the portion of the project which has a depth in excess of 20 feet but not in excess of 50 feet[.]''

BG Gulf Coast reads these provisions together to argue that ''amounts not to exceed those necessary'' means that the District may only use the fee to finance 25% of the Project, as (according to BG Gulf Coast) the District ''voluntarily agreed to pay more than 25% of the Project's total cost[.]'' The District agreed to cover around 40% of the project, but if the Project comes in under budget, BG Gulf Coast alleges that the District still plans to pay the amount it agreed to—in other words, it may end up covering 60%–80% of the Project. Because it voluntarily agreed to pay that much, ''the additional amount above 25% is not a 'requirement' of [33 U.S.C. § 2211],'' so the District has to cover anything above 25% with funds that do not come from the User Fee. Summing that up, BG Gulf Coast argues that § 2211(a)(1)(B) places a 25% cap on financing a non-federal interest's share of an improvement project because anything not ''require[d]'' by § 2211(a)(1)(B) is not ''necessary.''

The District responds with a different provision of § 2211. Subsection (e) says that before any construction begins on harbors, the Secretary of the Army and the non-federal interests ''shall enter into a cooperative agreement'' and that the non-federal interests ''shall agree to'' ''provide to the Federal Government the non-Federal share of all other costs of construction'' of the project. 33 U.S.C. § 2211(e)(4). So when § 2236(a)(1) says ''amounts not to exceed those necessary to carry out'' the financing of the Project, the District says that the cooperative agreement was necessary to carry out the Project, and so the User Fee can be used to cover its contractual obligation.

The district court did not squarely address that argument because it held that the 25% "requirement" is a floor, not a ceiling or a set amount. As everyone agrees, the District may voluntarily assume more than 25% of the cost of the project, which necessarily means that 25% is not both a floor and a ceiling. *Shall* does not mean *shall only*, and the statute contains no "up to" or "at least" language either. BG Gulf Coast then must turn to § 2236(a)(1) which limits fees to the "amount not to exceed those necessary" under § 2211. The district court said that it "cannot be that Section 2211 imposes a cap for the fee-based non-Federal share but not the alternatively funded non-federal share because that reading would require an express statutory provision. Section 2236(a)(1)'s language—'amount not to exceed those necessary'—is not enough."

The question is what § 2236(a)(1)(A)(i) means when it says that fees must be "in amounts not to exceed those necessary to carry out" the purpose of "financ[ing]" the Project "under the requirements of" § 2211. BG Gulf Coast says that the "necessary" amount under § 2211 is the 25% requirement in subsection (a). The District says that the "necessary" amount under § 2211 is the amount that the District agreed to cover in the cooperative agreement with the federal government in subsection (e). Sadly, Congress did not say what subsection it was thinking of when it said "under the requirements of" § 2211, and the most natural reading is that it meant all of its requirements.

The word "necessary" has been hard to pin down since *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 414 (1819). Black's Law Dictionary, before even getting to what the definition is, opens with this warning: "This word must be considered in the connection in which it is used, as it is a word susceptible of various meanings. It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, or conducive to the end sought." *Necessary*, Black's

Law Dictionary 928 (5th ed. 1979). And between the two, at least in the legal context, courts "rarely use 'necessary' in the latter sense." *Payne v. United States*, 289 F.3d 377, 389 (5th Cir. 2002) (Garza, J., dissenting in part). The term "necessary" here "does not exist in a vacuum," and its meaning "must be determined in the context in which [it] appear[s]." *Texas v. E.P.A.*, 983 F.3d 826, 837, 837 n.2 (5th Cir. 2020).

Section 2236(a)(1) is concerned with fees being levied "for the following purposes and in amounts not to exceed those necessary to carry out those purposes." The purpose relevant here is "to finance." And what can it finance? The District's share of the "construction and operation and maintenance costs" of the Project "under the requirements of" § 2211. Section 2211 has many requirements about costs under different specific circumstances, but if the purpose is "to finance" the District's share of the Project, the focus should be on what it had to do to secure financing. So it is true that paying 25% of the costs was necessary to secure financing vis-à-vis the fees, but the District *also* had to secure an agreement with the federal government under § 2211(e).

As BG Gulf Coast concedes, the Act gives the District discretion to go beyond that 25% amount for costs; it only sets a maximum on what percentage the federal government can spend. *See* 33 U.S.C. § 2280. With that discretion, because the amount of fees must be necessary to secure financing, and because the District had discretion to vary upward on the percentage of costs it covers, the term "necessary" more likely accords with the more permissive definition of the term. *Texas*, 983 F.3d at 837. What follows is that "necessary" means something more like "convenient, useful, appropriate, suitable, or *conducive to the end sought*." Black's, *supra* at 928 (emphasis added). *Cf.* 33 U.S.C. § 2236(a)(1) ("*necessary to carry out those purposes*" (emphasis added)). In this light, while it may not be strictly necessary to cover 40% of the costs under § 2236(a)(1) and § 2211(a), it was

convenient and conducive to financing the Project.  Thus, the District did not violate the Act by pledging to cover the costs above 25% with the proceeds of the User Fee.

BG Gulf Coast's argument hinges on a strict reading of "necessary." But context is needed to determine whether "necessary" means "absolute physical necessity" or merely "conducive to the end sought."  Under these circumstances, it is the latter.  Thus, the District can cover more than 25% of the cost with the User Fee proceeds.

## C.

BG Gulf Coast briefed several other arguments regarding the legality of the District's imposition of the User Fee.  In its thorough and well-reasoned opinion, the district court explained why those claims must be dismissed.  We agree with the conclusions reached by the district court and thus we do not disturb its holdings on appeal.

\*     \*     \*

Because the district court properly dismissed each of BG Gulf Coast's claims, we AFFIRM.