In the
United States Court of Appeals
For the Seventh Circuit

No. 99-2859

ROY L. ENDSLEY III and STEPHEN GRAHAM,
Individually and on Behalf of Those Similarly
Situated,

Plaintiffs-Appellants,

v.

CITY OF CHICAGO,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 8094--William T. Hart, Judge.


Argued April 20, 2000--Decided October 12, 2000


  Before Manion, Rovner, and Williams, Circuit Judges.

  Williams, Circuit Judge.  Plaintiffs challenge the
City of Chicago's use of tolls collected on the
Chicago Skyway to pay for some of the City's non-
Skyway related transportation improvements. In
1995, the Skyway began producing revenue that
exceeded its operating expenses. Prior to that
time, the City used Skyway tolls exclusively to
operate and maintain the Skyway. In 1996, the
City decided to refinance outstanding Skyway debt
and raise additional revenues for non-Skyway
expenses through a new bond issue ("Series 1996
Bond Issue"). Plaintiffs seek to prevent use of
Skyway revenues to pay for non-Skyway expenses
and challenge the City's action on four separate
grounds: (1) violation of federal transportation
statutes; (2) violation of antitrust laws; (3)
violation of the Constitution's dormant Commerce
Clause; and (4) violation of various state laws.
The district court dismissed plaintiffs'
complaint in its entirety for failure to state a
claim. Because we find that the City's use of
Skyway revenue for non-Skyway projects does not
amount to a constitutional violation of any sort,
we affirm.

I

  Roy Endsley and Stephen Graham are users of the

Chicago Skyway toll bridge, a 7.8 mile long high-speed, limited access highway that joins the Indiana Tollway with the rest of Interstate 90 at the Illinois-Indiana border. The Skyway is one of two Interstate routes that connect Chicago's Dan Ryan Expressway (Interstate 90/94) to the Indiana Tollway. The other is the Borman/Kingery/Bishop Ford Expressway (Interstate 80/94). When the Skyway was constructed in the late 1950s, it was paid for with private funds raised from the sale of revenue bonds in 1955 and 1957. Under the terms of the sale, the bonds were to be repaid solely from available Skyway toll revenues and the City itself was not obligated to repay the bonds.

The revenue raised by the Skyway tolls is heavily dependent on traffic volume. When traffic on the Skyway is heavy, more drivers pay the toll and more revenue is generated. Conversely, when traffic is low, the Skyway produces less revenue. On several occasions prior to 1996 (fourteen times), the City has raised the toll rates in order to pay the Skyway's maintenance and operating costs and to make the Skyway "a self-sufficient enterprise."[1] As a result, the current toll rate schedule ($2.00 or 25.6 cents per mile for most automobiles) is higher than the rate for other highways in the area.

Over the last ten years, the Skyway has enjoyed an increase in available funds. In 1991, the Skyway received $14.2 million in federal funds. In 1994, the City refunded the aggregate principal of outstanding Skyway revenue bonds by selling new ones. And in 1995, traffic volume on the Skyway increased significantly such that net revenues were projected to be $11.5 to $17.1 million annually through the year 2000. In 1996, the City sold Skyway bonds again ("1996 Bond Sale") and proceeds of the sale were sufficient to repay the outstanding aggregate principal amount of the 1994 bonds and the related refinancing costs. The excess $52 million raised was used to fund other City transportation improvements. As with past bond sales, the 1996 bonds are to be repaid solely from revenues the Skyway generates through tolls and concessions. At no time prior to 1996 did the City use Skyway revenue for purposes other than the maintenance and operation of the Skyway.

Endsley and Graham brought a class action suit against the City challenging its use of the $52 million raised by the 1996 Bond Sale for non-Skyway improvements. The City filed a motion to dismiss the action which the district judge granted pursuant to Federal Rule of Civil Procedure 12(b)(6). Endsley and Graham now appeal. We review the district court's decision

to grant a motion to dismiss de novo. See Hentosh v. Finch Univ. of Health Sciences, 167 F.3d 1170 (7th Cir. 1999).

II

On appeal, plaintiffs maintain that the City's use of proceeds from the 1996 Bond Sale for non-Skyway improvements violated various federal transportation statutes, antitrust laws, and the Commerce Clause of the Constitution. We consider each challenge in turn.

A.  Federal Transportation Statutes

Plaintiffs contend that the City has violated two federal transportation statutes, 23 U.S.C. sec. 301 and 23 U.S.C. sec. 129(a)(3)/2 which when read together, regulate the entities operating tollways and receiving federal funds. Section 301 generally prohibits state and local entities from charging tolls on highways that receive federal funding. Section 129 creates an exception to that rule, allowing operation of tollroads only under certain conditions. Endsley and Graham argue that the City's failure to meet the conditions required under sec. 129 gives rise to a private right of action. It is clear that the City has not violated sec. 301. However, plaintiffs insist that the City has violated sec. 129 and they try to liken the language of sec. 301, which at least one court has found does create a private right of action,/3 to that of sec. 129(a)(3), which on its face does not. The district court distinguished sec. 301 from sec. 129(a)(3) and rejected this approach. "If the City has violated sec. 129, any violation may be properly redressed by the Secretary of Transportation. . . . There is no compelling reason why private persons such as plaintiffs . . . should have the right to seek federal court action to aid in enforcement of this portion of the statute." The district judge's analysis is right on point. No express or implied private right of action was created by sec. 129. Neither a review of the language nor a consideration of the statute's intended beneficiaries, its legislative history, or the purpose of the statutory scheme suggest that it was. See Cort v. Ash, 422 U.S. 66, 78 (1975).

Nothing in the express language of the statute suggests that sec. 129(a)(3) creates a private right of action. Section 129 simply requires the Transportation Secretary and the tollway operating entity (here, the City) to enter into an agreement which sets forth a list of priorities for the spending of toll revenues by entities receiving federal funding under the

statute. Under such an agreement, the City would be required to use toll revenues first for debt service, then for reasonable return on private investment in the project, then for any maintenance and operation costs. Therefore, the City's use of funds for non-Tollway expenses before fulfilling these other obligations would violate the agreement between the City and the Secretary of Transportation, not sec. 129.

   Furthermore, a close review of the language, structure, and history of sec. 129 suggests that no implied private right of action exists either. As we acknowledged in Mallett v. Wisconsin Division of Vocational Rehabilitation, 130 F.3d 1245, 1248-49 (7th Cir. 1997), the Supreme Court has retreated from the four-part test established in Cort v. Ash, 422 U.S. 66, 78 (1975), to determine whether an implied cause of action exists under a statute./4 See also, Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15-16 (1979) ("[W]hat must ultimately be determined is whether Congress intended to create the private remedy asserted."). Instead of applying the four-part test, we now focus primarily on legislative intent. "Our inquiry is whether Congress intended an implied right of action . . . in light of the statute's language, structure, and legislative history. If such inferences of intent are not present, we must conclude that the essential predicate for implication of a private remedy does not exist." Mallett, 130 F.3d at 1249 (internal citations omitted).

   As we noted above, neither the language nor the structure of sec. 129 indicate that Congress intended to create a private right of action. A look at the legislative history suggests the same. Section 129 was created to authorize federal participation in, and funding for, the creation and maintenance of highways that facilitate travel among various states and cities./5 It is by and large an appropriations provision designed to "strengthen the highway and transit components of a national intermodal transportation" by contributing $153.5 billion in federal funds. See H.R. Rep. 102-171, at 10 (1991), reprinted in 1991 U.S.S.C.A.N. 1526. It is important to note that in enacting sec. 129, one of Congress' goals was to give state and local authorities more flexibility in spending federal highway funds. "The Committee feels that one of the most important things this legislation can do is give state and local officials the flexibility to make the crucial decisions on how their funds should be used. [Under sec. 129,] [t]hey will have the ability to choose the best transportation solution without the artificial constraints of funding categories." Id.

The provision upon which plaintiffs rely, sec. 129(a)(3), regulates the manner in which the entities operating federally funded tollways spend the revenues raised by the tolls charged. However, it does not operate to control state and local government use of tollway revenues completely. In fact, the legislative history indicates that Congress sought to encourage private investment in the nation's highways and public investment in privately operated toll roads such as the Skyway and give state and local entities more freedom to raise and use revenues as they see fit--just within certain limits./6 Although willing to permit these innovative partnerships to form through the use of federal funds on privately-owned toll roads, Congress enacted sec. 129(a)(3) to strike a balance among the private and public interests involved in the operation of tollways like the Skyway. The provision simply sets forth limitations on the use of revenues for those highways that receive funding from the U.S. Department of Transportation under the statute. The existence of these limitations do not lead us to the conclusion, however, that Congress intended to open the door to private enforcement of them.

As in other cases where the Supreme Court has found no implied right of private action, sec. 129 contains no judicial, or even administrative, remedy through which aggrieved persons can seek redress. See Blessing v. Freestone, 520 U.S. 329, 348 (1997) (holding that a Social Security Act provision contained no private remedy, either judicial or administrative, through which aggrieved persons could seek redress). Like many statutes appropriating federal funds and regulating the use of those funds, the only way sec. 129 assures that the City will abide by the statute's rules is through oversight by an executive agency official, here the Secretary of Transportation. Any violation of the provision's mandates will be handled by the Secretary of Transportation, not private citizens. It is as Congress intended it to be. A strong presumption exists against the creation of an implied private right of action and where, as here, there is nothing in the legislative history to suggest that such a right was intended, we will not imply a private right of action where none appears in the statute. See Statland v. American Airlines, Inc., 998 F.2d 539, 540 (7th Cir. 1993) (quoting West Allis Mem'l Hosp., Inc. v. Bowen, 852 F.2d 251, 254 (7th Cir. 1988)).

Seeking to salvage their transportation statute claims, plaintiffs also challenge the district court's denial of their motion for leave to amend the complaint. The district court correctly

denied this motion. For even if plaintiffs were to bring the sec. 129 claims by way of 42 U.S.C. sec. 1983, they would still lose. "Section 1983 is not available to enforce a violation of a federal statute where Congress has foreclosed enforcement in the enactment itself and 'where the statute did not create enforceable rights, privileges, or immunities within the meaning of sec. 1983.'" Suter v. Artist M., 503 U.S. 347, 355-56 (1991), (citing Wright v. Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 423 (1987)). As such, the district judge did not err in denying plaintiffs' motion to amend.


B.   Section 2 of the Sherman Act

Plaintiffs next seek relief under sec. 2 of the Sherman Act./7 The district court held that plaintiffs failed to plead sufficient facts to show the City possessed monopoly power as required under the Act. Section 2 forbids not the intentional pursuit of monopoly power but the employment of unjustifiable means to gain that power. See 3 P. Areeda & D. Turner, Antitrust Law para. 626c, at 76 (1978). "The offense of monopoly under sec. 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 481 (1992) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). In support of their argument, plaintiffs assert that the Skyway is the "only high-speed limited access route connecting the Dan Ryan expressway in Chicago to the Indiana Tollway." To satisfy the second element, plaintiffs maintain that by charging an arbitrary and unreasonable toll which brings in revenue exceeding the cost of operating the Skyway, the City is engaging in anti-competitive conduct.

As a preliminary matter, plaintiffs argue that the district judge erred in taking up the question of market power on a motion to dismiss. He did not. We acknowledge that frequently, questions of whether the defendant possessed the requisite market power to establish a monopoly are addressed in a motion for summary judgment or trial. See State of Ill. v. Panhandle E. Pipe Line Co. Med. Ctr., 935 F.2d 1469, 1472 (7th Cir. 1991); Nelson v. Monroe Reg'l Med. Ctr., 925 F.2d 1555, 1557 (7th Cir. 1990). However, where plaintiffs fail to identify any facts from which the court can "infer that defendants had sufficient market power to have been able to

create a monopoly," their sec. 2 claim may be properly dismissed. Hennessy Indus. Inc. v. FMC Corp., 779 F.2d 402, 405 (7th Cir. 1985). See also, BCB Anesthesia Care v. Passavant Mem'l Area Hosp. Ass'n, 36 F.3d 664, 668 (7th Cir. 1994) (affirming dismissal of a Sherman Act claim on a motion to dismiss, noting, "sometimes the conclusion follows a motion to dismiss; more often the decision is one of summary judgment, but often it appears that the record relied upon [in rejecting plaintiff's antitrust claim] is the absence of facts indicating special circumstances raising antitrust concerns").

Here, plaintiffs' complaint does not contain facts allowing an inference that the City has monopoly power. It is true that Leatherman v. Tarrant County, 507 U.S. 163 (1993), bars the district court from applying a heightened pleading standard in antitrust cases. See MCM Partners v. Andrews-Bartlett & Assocs., 62 F.3d 967, 976 (7th Cir. 1995). However, to survive a motion to dismiss, plaintiffs still must set forth facts sufficient to create an inference that defendant had enough market power to create a monopoly. See Hennessy, 779 F.2d at 405. The facts do not suggest that the City has monopoly power in the relevant market (high-speed limited access routes connecting Chicago to Indiana). At least two alternate routes, the Borman/Kingery/Bishop Ford Expressway and the Tri-State Tollway, "compete" with the Skyway. While the Skyway may be the more desirable route, it is not the only high-speed roadway between Chicago and the Indiana Tollway. If the Skyway tolls become too high, drivers will take one of the alternate routes. The availability of these very viable options for a high-speed access route linking Chicago to Indiana indicates that the City does not have monopoly power over the relevant market.

Even if it could be said that the City possessed monopoly power, plaintiffs have not presented sufficient facts to meet the second requirement under sec. 2, anti-competitive behavior or abuse of market power. The mere existence of the power to control prices or exclude competition is not unlawful unless it is coupled with intent. See United States v. Griffith, 334 U.S. 100, 107 (1948), disapproved on other grounds by Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752 (1984). By intent, we do not mean intent to obtain a monopoly or to capture an ongoing increase in market share. This of course is the aim of every business endeavor. Under sec. 2, intent to obtain a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly power by anti-competitive means. As such, the Sherman Act does not prohibit an entity possessing market power

from simply raising prices in order to increase revenues. For a sec. 2 violation, more is needed. See U.S. Steel Corp. v. Fortner Enters., Inc., 429 U.S. 610, 612 (1977).

The City's decision to raise the cost of Skyway tolls and raise additional revenue for other transportation projects is not, in and of itself, anti-competitive. To the contrary, we have recognized that "[v]irtually all business behavior is designed to enable firms to raise their prices above the level that would exist in a perfectly competitive market." Panhandle E. Pipe Line, 935 F.2d at 1481. In fact, we have noted that when an entity raises prices, competition is enhanced and therefore, in some cases, anti-trust claims are precluded. See O.K. Sand & Gravel, Inc. v. Martin Marietta Technologies, Inc., 36 F.3d 565, 573 (7th Cir. 1994) (citations omitted). While a consumer may suffer anti-trust injury when higher prices result from some unlawful monopolistic conduct, in this case, plaintiffs have not identified such conduct./8 Plaintiffs plead facts showing the City using anti-competitive behavior neither in their alleged attempt to gain monopoly power (such as forming a conspiracy or an unlawful combination), nor in their alleged attempt to maintain it (such as tying Skyway use to another product)./9 They cite only the higher Skyway tolls, or the "overcharge" as they label the increased tolls, as evidence of unlawful anti-competitive behavior. Plaintiffs have failed to identify any facts which point to the City's alleged anti-competitive use of its power to control the price of the Skyway tolls. Therefore, we conclude that the district court did not err in dismissing plaintiffs' antitrust claim./10

C.  Commerce Clause

Finally, plaintiffs assert that because the Skyway financing scheme and the tolls charged are not apportioned to the use or cost of operating the Skyway, the City has unreasonably burdened interstate commerce and violated the Constitution's dormant Commerce Clause. The Commerce Clause is an affirmative grant of power to Congress. U.S. Const. art. I, sec. 8, cl. 3. Where Congress has not exercised its powers under the Commerce Clause, states generally are free to legislate over that area unless or until Congress decides to take action. The Supreme Court has read the Commerce Clause to create not only affirmative powers to legislate, but also a negative implication that limits state action as well. See Hughes v. Oklahoma, 441 U.S. 322, 326 (1979); Southern Pac. Co. v. Arizona, 325 U.S. 761, 769 (1945); Gibbons v. Ogden, U.S. (9. Wheat) 1, 199-200 (1824). As a result, the

dormant Commerce Clause is invoked to scrutinize state regulations that burden interstate commerce, even in the absence of conflicting congressional legislation.

Under dormant Commerce Clause precedent, "a levy is reasonable . . . if it (1) is based on some fair approximation of use of the facilities, (2) is not excessive in relation to the benefits conferred, and (3) does not discriminate against interstate commerce." Northwest Airlines, Inc. v. County of Kent, Mich., 510 U.S. 355, 369 (1993). Rather than argue that its Skyway tolls meet this test, in its defense the City asserts that since it acts as a proprietary enterprise in its operation of the Skyway, its decision to raise the Skyway tolls and use revenue for non-Skyway expenses is protected by the market participant doctrine. The market participant doctrine "differentiates between a State's acting in its distinctive governmental capacity, and a State's acting in the more general capacity of a market participant; only the former is subject to the limitations of the negative Commerce Clause." New Energy Co. of Ind. v. Limbach, 486 U.S. 269, 277 (1988).

Therefore, the question before us is whether in operating the Skyway, the City was acting as a participant or regulator of the local highway system. Here, plaintiffs sealed their own fate by including in their complaint the following: "Since its inception, the City has operated the Skyway as a proprietary enterprise, and not in its governmental capacity." We have long held that a plaintiff may plead himself out of court by including factual allegations which, if true, show that his legal rights were not invaded. See Stewart v. RCA Corp., 790 F.2d 624, 632 (7th Cir. 1986), American Nurses' Ass'n v. Illinois, 783 F.2d 716, 724 (7th Cir. 1986). In affirmatively stating that the City runs the Skyway as a proprietary enterprise, plaintiffs fatally injure their Commerce Clause claim.

Even if plaintiffs had not plead themselves out of court, the facts suggest that the City was indeed a market participant. "The market-participant doctrine permits a State to influence a discrete, identifiable class of economic activity in which it is a major participant." South-Central Timber Dev. v. Wunnicke, 467 U.S. 82, 97 (1984) (internal citations omitted). Courts have recognized the operation of private toll roads as legitimate economic activity. See Overstreet v. North Shore Corp., 318 U.S. 125, 127 (1943); Lane Construction Corp. v. Highlands Ins. Co., et al., 207 F.3d 718, 720 (4th Cir. 2000). The City sold revenue bonds to pay for construction of the

Skyway and funds Skyway maintenance and operation by charging drivers a toll. As owner and operator of the property, the City offers drivers access to the Skyway in exchange for a fee. At times, when the Skyway was not raising sufficient revenue, the City would fund debt service and maintenance costs. These facts suggest that the City was acting as a property owner, using its property to raise money, not as a regulator.

Plaintiffs contend that while the City may be acting as a market participant, at the same time, by levying a toll on the Skyway, it is acting (in a hybrid role) as a market regulator. Courts interpreting the Commerce Clause have long struggled to draw the line between that which is considered a government function or regulatory activity and that which is considered proprietary activity. See Garcia v. San Antonio Metropolitan Transit Auth. 469 U.S. 528, 545 (1985) ("the goal of identifying 'uniquely' governmental functions, for example, has been rejected by the Court . . . in part because the notion of a 'uniquely' governmental function is unmanageable."); Nat'l League of Cities v. Usery, 426 U.S. 833, 851 (1976) (attempting to define the scope of governmental functions protected from federal regulation under the Commerce Clause), overruled by Garcia, 469 U.S. at 557; New York v. United States, 326 U.S. 572, 584 (1946) (concluding that the distinction between 'governmental' and 'proprietary' functions was 'untenable' and that it had to be abandoned). However, in determining whether the market participant doctrine applies, we have remained loyal to this cumbersome, yet necessary dichotomy. E. & E. Hauling v. Forest Preserve Dist. of DuPage County, Ill., 821 F.2d 433, 438 (7th Cir. 1987) (finding that the Forest Preserve acted as regulator not a market participant); W.C.W. Window Co. v. Bernardi, 730 F.2d 486, 494 (7th Cir. 1984) (citing White v. Mass. Council of Construction Employers, Inc., 460 U.S. 204 (1983)). Where, as here, the facts and circumstances suggest that a government entity is acting as a market participant rather than a market regulator, the doctrine will apply and that entity will not be subjected to the limitations provided by the dormant Commerce Clause.

A government entity is acting as a market regulator when it enacts rules that "whether by statute, regulation, or contract, . . . have a substantial regulatory effect outside of that particular market." South-Central Timber, 467 U.S. at 97. In support of their position, plaintiffs cite the Fifth Circuit case, New Orleans S.S. Ass'n v. Flaquemines Port, Harbor and Terminal Dist., 874 F.2d 1018 (5th Cir. 1989) (holding that a New Orleans port could charge

ships traveling the Mississippi River a reasonable port fee for emergency response services without violating the Commerce Clause). This case actually offers support for the City's market participant argument. The court explained that the Port acts as a market participant when it "offers a service and receives payments tied to the costs of providing the service, just as would a private business. This fee-for-service approach is not a regulation, as, for example, would be a rule requiring every ship to provide its own fire fighting and rescue equipment." Id. at 1021. While the court noted that the Port was also acting in its capacity as government regulator of health and safety by using the money for emergency response services, the circumstances here are distinguishable. Nothing about the City's efforts to raise revenue by charging a Skyway toll suggests that it is acting as a regulator rather than a market participant./11

Overall, the facts suggest that the City is protected by the market participant doctrine. As such, the district judge correctly dismissed plaintiffs' Commerce Clause claims.

III

For the reasons set forth above, we AFFIRM.

/1 Oftentimes, the toll rates were increased pursuant to a federal court order which came out of a lawsuit brought by bondholders against the City.

/2 29 U.S.C. sec. 301 reads, "Except as provided in section 129 of this title with respect to certain toll bridges and toll tunnels, all highways constructed under the provisions of this title shall be free from tolls of all kinds."

29 U.S.C. sec. 129(a)(3) reads:

Before the Secretary may permit Federal participation under this subsection in construction of a highway, bridge, or tunnel located in a State, the public authority (including the State transportation department) having jurisdiction over the highway, bridge, or tunnel must enter into an agreement with the Secretary which provides that all toll revenues received from operation of the toll facility will be used first for debt service, for reasonable return on investment of any private person financing the project, and for the costs

necessary for the proper operation and maintenance of the toll facility, including reconstruction, resurfacing, restoration, and rehabilitation. If the State certifies annually that the tolled facility is being adequately maintained, the State may use any toll revenues in excess of amounts required under the preceding sentence for any purpose for which Federal funds may be obligated by a State under this title.

/3 In Clallam County v. Washington, the Ninth Circuit held that sec. 301 provides the predicate right giving rise to a sec. 1983 action, because while Congress neither created nor prohibited an express remedy under Title 23, sec. 301 (mandating toll-free bridges) was intended to aid bridge users, by providing free access across waterways. Therefore, the plaintiffs were members of a class granted enforceable rights. 849 F.2d 424, 429 (9th Cir. 1988).

/4 Under Cort, to determine if Congress intended to create a private right of action, the court would consider: 1) whether the plaintiff is a member of the class for whose benefit the statute was enacted; 2) whether there is any indication of legislative intent to create or deny such a remedy; 3) whether an implied remedy is consistent with the underlying purposes of the statutory scheme; and 4) whether the cause of action is one traditionally relegated to the states so that it would be inappropriate to infer a federal remedy. Cort, 422 U.S. at 78.

/5 Generally, the Intermodal Surface Transportation Efficiency Act of 1991 Pub. L. 102-240, 105 Stat. 1914, was established "to develop a national intermodal surface transportation system, to authorize funds for construction of highways, for highway safety programs, and for mass transit programs, and for other purposes." (codified as amended at 23 U.S.C. sec. 129 (2000)).
/6 "The public-private partnership is important and should be encouraged. From the Federal perspective, one of the ways to approach infrastructure improvement would be to ease unnecessary Federal constraints preventing the mixing of Federal dollars with private funds on projects." Id. at 27.

/7 15 U.S.C. sec. 2 provides in pertinent part, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony. . . ." Originally, plaintiffs sought relief pursuant to sec. 1 of the Sherman Act as well. However, as they fail to raise any argument concerning sec. 1 in their briefs, we will

address their sec. 2 claim only.

/8 See O.K. Sand & Gravel, 36 F.3d at 573 ("if . . . [plaintiff] were arguing that it was injured as a consumer, higher prices in output due to an unlawful combination would be the 'type' of injury the antitrust laws intend to prevent").

/9 On appeal, plaintiffs rely solely on their assertion that the City abused its market power by raising the Skyway tolls and using revenues for non-Tollway expenses. They do not revisit their argument that the City has engaged in an unlawful tying arrangement by conditioning access to the Skyway on payment of money to fund non-Skyway transportation improvements. Even if they did, a review of the law and common sense suggests that this argument also fails. "A tying arrangement cannot exist unless two separate product markets have been linked." Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 20-21 (1984). Drivers who pay Skyway tolls are not purchasing a separate product that is somehow linked to the Skyway. The non-Skyway transportation improvements involve streets and roads throughout the city that drivers use for free.

/10 As we have found that plaintiffs cannot meet the requirements to show a sec. 2 Sherman Act violation, we need not reach the City's state action immunity defense.

/11 Even though it considered the Port's activity a hybrid of market regulation and participation, the court in New Orleans Steamship, affirmed the district court's dismissal of plaintiffs' claims. The Fifth Circuit held that charging ships for access to certain services was permissible under the Commerce Clause. New Orleans Steamship, 874 F.2d at 1022.