In the

# United States Court of Appeals
### For the Seventh Circuit

No. 01-2727

MIDWEST GAS SERVICES, INC.
and MIDWEST GAS STORAGE, INC.,

*Plaintiffs-Appellants*,

*v.*

INDIANA GAS COMPANY, INC.,
INDIANA ENERGY SERVICES, INC.,
and PROLIANCE ENERGY, LLC,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. IP-99-0690-C-D/F—**Richard L. Young**, *Judge.*

ARGUED JANUARY 16, 2002—DECIDED JANUARY 22, 2003

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* The plaintiffs in this antitrust action, Midwest Gas Services, Inc. (Services) and Midwest Gas Storage, Inc. (Storage), appeal from the district court's dismissal of their lawsuit. In granting separately filed motions to dismiss defendants Indiana Gas Company, Inc. (IG), Indiana Energy Services, Inc. (IES), and ProLiance Energy, LLC (ProLiance), the district court ruled that the plaintiffs failed to properly show that they had standing to sue under the antitrust laws and had suffered injuries

covered by the antitrust laws. For the reasons described below, we affirm the district court in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

Indiana Gas, a local natural gas utility, services 50 counties in southern and central Indiana. The natural gas industry is partially deregulated, with companies like Indiana Gas providing traditional public utility services for small customers within their service area. These utilities, called Local Distribution Companies (LDCs), are regulated by the relevant state authority.[1] In Indiana, the state authority is the Indiana Utility Regulatory Commission (IURC), which allows LDCs such as IG to unbundle their distribution charges. This allows large volume customers or "transport eligible customers," including industrial and institutional buyers, to buy their gas and interstate transportation of that gas from the source to its destination on the open market. Gas delivered through interstate pipelines for transport-eligible users is brought as far as the connection to IG's distribution network. Indiana Gas, as an LDC, is required to transport the gas from that point to the end user, receiving a fee for this last piece of the transportation puzzle. This is compared to the traditional fee structure used by LDCs for their residential and other small-quantity customers, who pay one bundled rate combining gas and all of the gas transport charges.

The right to transport natural gas within the interstate pipeline system from one point to another on a specific

---

[1] LDCs do not fall under the authority of the Federal Energy Regulatory Commission (FERC) jurisdiction except for those operations that cross state lines.

pipeline is "capacity" and may be freely bought and sold by the pipelines, LDCs, transport-eligible end users, or brokers. In addition, capacity can be partitioned using secondary delivery points. For example, a holder of capacity on a particular pipeline from Point A to Point Z (the two primary delivery points) can sell their rights so that one party buys the Point A-to-Point D segment, another acquires the Point G-to-Point Q segment, and a third purchases the Point S-to-Point Z segment, with Points D, G, Q, and S being secondary points where gas is put into or taken out of the pipeline. This means that instead of relying on one pipeline to transport gas from the wellhead to its final destination, a "virtual pipeline" can be constructed by piecing together capacity along different intersecting pipelines to its final destination. Of course, most end users are not willing to take on these logistics, so companies like Services and ProLiance act as brokers who put together supply and transport contracts for their customers.[2] *See generally* FERC Order No. 637, Regulation of Short-Term Natural Gas Transportation Services, Etc., 65 Fed. Reg. 10,155, 10,157-58, 10,185-95 (Feb. 25, 2000); John Decker, Note, *Authorization of Natural Gas Pipeline Construction: Moving Decisions From Regulators to the Marketplace*, 12 VA. ENVTL. L. J. 505, 508 (1993).

---

[2] "Transport eligible" customers can purchase two types of gas transport services—firm and interruptible. Firm service is the guaranteed right to receive a certain volume of gas via a specific pipeline. Interruptible service is the right to receive a certain volume of gas from a pipeline out of the excess capacity the pipeline has available, *i.e.*, the pipeline's surplus capacity left after the pipeline has met the needs of its firm service customers. Interruptible service customers usually have alternative fuel sources for their energy needs, such as fuel oil or coal, while firm capacity customers are able to use natural gas as their exclusive fuel source. This case only involves firm capacity.

An LDC is required to provide guaranteed service for its residential customers and those other small-scale customers who rely on the LDC for bundled gas and gas transport services. To guarantee that it will have enough capacity during times of peak demand (such as the winter heating season), an LDC must purchase capacity in excess of its average needs. It could turn around and sell this excess capacity via short-term contracts just like any other holder of capacity. IG, as an LDC, was required by the IURC to make its excess capacity available to the market on an equal-access basis, where it could be acquired by others intending to use or resell the capacity.

ProLiance was formed in 1996 as a 50/50 joint venture between a sister company of IG, IGC Energy, Inc.,[3] and a wholly-owned subsidiary of a different LDC in Indiana, Central Gas & Coke Utility (CG). ProLiance works with IG and CG to provide all of their gas supplies, purchasing sufficient capacity to serve both IG and CG's requirements. In addition, ProLiance acts as a marketer of gas and gas transportation for transport-eligible end users, selling the surplus capacity it acquires as a result of servicing IG and CG's needs back into the marketplace. Because ProLiance does not provide any public utility functions, ProLiance is not subject to IURC regulations and, therefore, unlike IG and CG, is not required to sell off its surplus capacity to the general marketplace. From 1994-96, before ProLiance was created, IG created a marketing affiliate, IES, which provided similar services in the same manner as ProLiance, but only for IG.

Storage operates a gas storage field in Clay County, Indiana, and is the only independent gas storage field in IG's service area. Storage functions as a kind of gas

---

[3] Both IGC Energy, Inc. and IG are wholly-owned subsidiaries of Indiana Energy, Inc.

warehouse, where customers can store gas in preparation for high-demand times, or as a kind of bridge, routing the gas from one pipeline connected into the storage field, through the field, and out a different pipeline. Storage was authorized by FERC to operate the field in 1991. The field was once connected to the Terre Haute Gas Company's distribution system, which was in turn connected to Texas Gas Transmission's (TGT's) interstate pipeline. IG purchased the Terre Haute facilities in 1990. The field is also located close to the Panhandle Eastern Pipeline's interstate pipeline (PEPL), and a connection between the PEPL pipeline and the storage field was completed in 1994.

Services, a marketing affiliate of Storage, saw an opportunity in the storage field's proximity to the TGT and PEPL pipelines. The TGT pipeline transports gas to Indiana from wells on the coast of the Gulf of Mexico, gas that costs more than the PEPL gas from north Texas and Oklahoma. If Storage could connect to the IG/Terre Haute system, transport-eligible customers in IG's distribution system who had previously purchased high-priced gas from the TGT pipeline could buy cheaper gas from the PEPL pipeline, using the storage field as a shortcut which would eliminate the extra transportation fees that would otherwise make such a choice financially unattractive. Also, Services could market the storage field to customers for gas storage, allowing them to hedge against seasonal upswings in gas prices. The problem with this plan was that Storage's storage field was no longer connected to the Terre Haute/ IG system. Though the necessary connections would only have to span thirty feet at one point and a mile at another, Storage needed to negotiate with IG to establish the interconnect between the respective facilities.

After a series of failed negotiations with IG in an attempt to establish the interconnect, the plaintiffs filed a complaint in February 1999 alleging antitrust violations by IG and two state law claims. They then filed an amended

complaint which named IES and ProLiance as additional defendants and added a claim of anticompetitive tying. IG moved for judgment on the pleadings, which the district court denied. On a motion for reconsideration, the district court granted IG's motion regarding the tortious interference with prospective economic advantage claim, but otherwise found that the plaintiffs had standing to assert their claims. ProLiance moved to dismiss the claims against it pursuant to Federal Rule of Civil Procedure 12(b)(6), and the district court granted the motion, finding that the plaintiffs failed to establish both antitrust injury and antitrust standing. Acting *sua sponte*, the district court reconsidered IG's motion for judgment on the pleadings and granted the motion on the same grounds as ProLiance's motion. IES then moved for judgment on the pleadings, and the district court granted IES's motion on the same grounds.

## II.  ANALYSIS

We review a district court's grant of a Rule 12(b)(6) motion to dismiss and a Rule 12(c) motion for judgment on the pleadings de novo. *See Velasco v. Ill. Dept. of Human Servs.*, 246 F.3d 1010, 1016 (7th Cir. 2001). Grants of either motion are proper only if "it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998); *Gustafson v. Jones*, 117 F.3d 1015, 1017 (7th Cir. 1997). In evaluating the motion, we accept all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in favor of the plaintiff. *Forseth v. Village of Sussex,* 199 F.3d 363, 368 (7th Cir. 2000); *Gustafson*, 117 F.3d at 1017.

In its orders granting the defendants' motions to dismiss and for judgment on the pleadings, the district

court found that the plaintiffs did not allege injuries sufficient to maintain antitrust claims. Relying on the Sixth Circuit's opinion in *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972 (6th Cir. 2000), the district court found that as competitor companies, the plaintiffs could only demonstrate an antitrust injury if their exclusion from the marketplace eliminated a superior competing product or lower-cost alternatives.

Here, the district court concluded, ProLiance competed with Services. Services' revenues from transportation and gas sales were reduced, but it could not demonstrate that it had a superior or cheaper product. Since it believed that Services was a competitor and not a customer of the defendants, and since Storage was neither a competitor nor consumer of the defendants, the district court concluded that the plaintiffs could not demonstrate that they had standing to bring an antitrust claim. The district court further explained that even if the plaintiffs could demonstrate that they were proper parties to bring an antitrust suit against the defendants, it considered dispositive the Indiana Supreme Court's finding that ProLiance's formation was in the public interest and did not injure competition. *See United States Gypsum, Inc. v. Ind. Gas Co., Inc.*, 735 N.E.2d 790, 803-04 (Ind. 2000). Since, according to *United States Gypsum*, ProLiance did not injure competition, the district court concluded that the plaintiffs could not establish that they had suffered an antitrust injury, making dismissal of their claims appropriate.

The district court's reliance on *Indeck* is misplaced because the plaintiffs here allege more and different allegations than those in that Sixth Circuit case. In *Indeck*, the plaintiff energy supplier was rebuffed by Consumers Energy when Consumers required additional energy to service its accounts. Instead, Consumers purchased power from one of its affiliates. Indeck claimed that it lost busi-

ness to a competitor that was affiliated with the customer, but not "that a less-than-arm's-length transaction destroyed or damaged the competitive environment in power generation." *Indeck*, 250 F.3d at 978. Here, the plaintiffs allege antitrust claims not only based on the affiliation between the defendants, like Indeck, but also that certain business practices by and between the defendants injure competition.

The district court here, relying on the reasoning of *Indeck*, found that neither plaintiff was able to show that it was a proper plaintiff to bring an antitrust claim. We keep in mind that to survive a motion to dismiss or judgment on the pleadings, a plaintiff need not include the particulars of his claim; only a "short and plain statement" is needed. FED. R. CIV. P. 8(a)(2); *see MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 976 (7th Cir. 1995). This is also true for antitrust cases. Though the "short and plain statement" of an antitrust claim must demonstrate "antitrust injury" and "antitrust standing," antitrust plaintiffs need not plead to a heightened level of particularity. *See Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993); *S. Austin Coalition Cmty. Council v. SBC Communications Inc.*, 274 F.3d 1168, 1171 (7th Cir. 2001); *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 782 (7th Cir. 1994). While we agree with the district court that the plaintiffs do not have standing to assert certain antitrust claims, for the same reasons that the Sixth Circuit found in *Indeck*, we also find that they have shown their ability to assert other claims. We address these allegations in turn.

A.  Conspiracy to Restrain Trade

The plaintiffs' conspiracy claim alleges that IG and PEPL conspired to prevent Storage from existing as a viable gas

storage facility by refusing to allow it physical access to their facilities, which frustrated Services' contracts with customers in IG's service area. The amended complaint describes communications between PEPL and IG officials who apparently discussed ways to prevent Storage from both establishing an interconnect with the IG distribution system and being designated a secondary receipt point for gas transported by PEPL. The frustration of these efforts, according to Services, prevented it from selling gas services to customers who would have used Storage's storage field and its interconnects with the IG distribution system and PEPL's pipeline.

For Services to properly plead an antitrust suit under § 4 of the Clayton Act, it is required to show that it has "antitrust standing," *i.e.*, that its claimed injuries "reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *see also AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 575 (7th Cir. 1999). Whether a plaintiff has antitrust standing depends on offense-specific factors, including: "(1) [t]he causal connection between the alleged anti-trust violation and the harm to the plaintiff; (2) [i]mproper motive; (3) [w]hether the injury was of a type that Congress sought to redress with the antitrust laws; (4) [t]he directness between the injury and the market restraint; (5) [t]he speculative nature of the damages; (6) [t]he risk of duplicate recoveries or complex damages apportionment." *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 927 (7th Cir. 1995) (listing factors drawn from *Assoc. Gen. Contractors of Cal. Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535-36 (1983)). Of these factors, we need only be concerned here with the directness between Services' claimed injury and the alleged market restraint.

Services' claimed injury did not stem directly from the purported IG-PEPL conspiracy, but rather the alleged conspiracy's effect on Storage, whose position as a bridge between the TGT and PEPL pipelines was necessary for Services to create the arbitrage opportunities for its customers. Services is not alleging that it was completely prevented from supplying its customers, but that it could not promote and take advantage of the opportunity that an IG-Storage connection would have provided. Services' injury, therefore, is derivative to that of Storage, which is the party directly injured by the alleged conspiracy. Since Services cannot demonstrate that it has suffered an antitrust injury directly resulting from the conspiracy, the district court properly dismissed Services' conspiracy claim.

The defendants argue that Storage has pleaded itself out of a claim due to the amended complaint's description of the relevant market as "the market for transporting and selling gas to end users that are allowed by tariff to receive transported natural gas in the 50 counties in north central, central and southern Indiana in which Indiana Gas is an LDC." The defendants point out that because Storage is not permitted under its FERC operating certificate to sell natural gas or gas transport to end users, it cannot be a participant in the market which it claims is injured by the defendants' actions.

While it is true that Storage's operating certificate only allows it to construct and operate the storage field, not to sell or market natural gas, FERC Order Issuing Certificate, Docket No. CP90-454-000, at 13 (April 30, 1991), storing natural gas is integral to its transportation. Just as a pipeline that bridges two other pipelines is part of the transportation network that the appellants claim as their market, so is a storage field that is connected to different pipelines. FERC recognized this when it described "transportation" to include "*storage*, exchange, backhaul,

displacement, or other methods of transportation" in its regulations concerning natural gas transportation. 18 C.F.R. § 284.1 (emphasis added). We therefore find that Storage is a participant in the relevant market and for that reason is not barred from asserting its claims.

Storage further alleges that IG, ProLiance, and PEPL conspired to isolate Storage by refusing it access to their transportation facilities, thereby preventing Storage from being able to deliver gas to end users. Because Storage is directly affected by this alleged conspiracy, and Services is not, Storage is the proper plaintiff to bring this claim. To properly allege a conspiracy under § 1 of the Sherman Act, a plaintiff need only allege that the conspiracy unreasonably restrained competition in a relevant market. *See MCM Partners*, 62 F.3d at 976. Since Storage has described such a conspiracy and is a participant in the claimed market, we find that the district court erred when dismissing this claim.

B.   ProLiance as an Illegal Combination

The plaintiffs' second § 1 claim alleges that the formation of ProLiance by Indiana Gas and Central Gas is a combination that acts as an unreasonable restraint of trade. ProLiance is a 50/50 joint venture that combined IG and CG's gas marketing and sales arms; it does not transport gas itself, nor does it involve IG or CG's other regulated utility functions. As described by the plaintiffs in the amended complaint, ProLiance "competes directly with other gas marketers, such as Services. ProLiance markets to the large commercial and industrial customers Services contracted with and hoped to contract with." However, the amended complaint does not allege that ProLiance's market dominance came from combining the market shares of these two offices. Transfer of a business from one company to another, without alleging an effect on

competition as a result of the combination, cannot be an antitrust violation, because "the antitrust laws . . . were enacted for 'the protection of competition, not competitors.'" *Brunswick*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)).

Plaintiffs claim that as a result of ProLiance's formation, they have been unable to gain enough customers to profit from the regulations that allow brokers to sell gas and gas transportation to transport-eligible customers. However, ProLiance has simply taken on the role that IG's marketing department assumed earlier, though with greater success. The transfer of a competitor's business to a different competitor, one who is able to more effectively compete in the marketplace, is not an antitrust violation. What the plaintiffs describe in their complaint regarding the formation of ProLiance is no different than the situation in *Brunswick*, where a number of failing businesses were acquired by a large corporation that was able to place them on a solid footing and have them compete effectively in the marketplace. *Brunswick*, 429 U.S. at 488. While plaintiffs may be able to show that ProLiance acquired advantages in the gas transportation market based on dealings with Indiana Gas and CG, "[a] private antitrust plaintiff . . . does not acquire standing merely by showing that he was injured by the defendant's conduct." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995); *see also Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 115-17 (1986). Because the plaintiffs could not demonstrate that they had standing, the district court correctly dismissed this § 1 claim.

The defendants also point to the IURC's approval of ProLiance's formation, a decision affirmed by the Indiana Supreme Court in *United States Gypsum*. They claim that as a result of this decision, ProLiance's formation has been immunized via the state action doctrine (though ProLiance, as a non-regulated entity, is not strictly under

the jurisdiction of the IURC). While it is true that Pro-Liance's formation was found to be "in the public interest," plaintiffs' failure to adequately plead a viable § 1 claim regarding ProLiance's formation means that we need not address this affirmative defense.

C.  Tying

ProLiance allegedly has been illegally tying its sale of natural gas to its sale of gas transport services, *i.e.*, customers have been told that in order to purchase gas transport, they must purchase the gas itself from ProLiance. When evaluating a tying claim, "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984).

An underlying question regarding this tying claim is whether the plaintiffs have suffered an antitrust injury as a result. Suits cannot be brought under § 4 of the Clayton Act unless "a private party is *adversely* affected by an anticompetitive aspect of the defendant's conduct." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 339 (1990) (citing *Brunswick*, 429 U.S. at 487) (emphasis in original). Neither plaintiff claims that the prices that ProLiance charged for the gas itself or its transportation were predatory, or that ProLiance somehow injured its customers by charging excessive prices for either gas transportation or gas. Rather, the plaintiffs claim injury because they "have been unable to profit from Rates 45, 60 and 70, or to otherwise compete with ProLiance and IES in the sale of natural gas and its transportation. Plaintiffs have lost the transportation fees and marketing profits they otherwise would have earned had they been permitted to

compete in the relevant market." While they may have lost profits as a result of ProLiance's sales, failure to realize expected profits due to competition is not an antitrust injury, because "a plaintiff can only recover if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior." *Atl. Richfield*, 495 U.S. at 344. The plaintiffs' claim is, in essence, that ProLiance is able to use its large market share to purchase natural gas in bulk, and sell that gas, along with the gas transportation it controls, to customers at a lower margin than its competitors because of its high sales volumes. That the plaintiffs' losses stem from this behavior and not behavior that is anticompetitive, *e.g.*, predatory pricing, means that they cannot make a tying claim against ProLiance that can withstand a motion to dismiss, since "the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." *Cargill*, 479 U.S. at 116; *see also Atl. Richfield*, 495 U.S. at 340-41; *Jefferson Parish*, 466 U.S. at 14.

### D.   Monopoly Maintenance and Attempted Monopolization

The plaintiffs' § 2 claims describe IG and ProLiance (and IES, as ProLiance's predecessor) as maintaining, or in the alternative, attempting to acquire, a monopoly in the distribution of natural gas and its transportation to transport-eligible customers in IG's service area. These claims take two forms: first, that IG and ProLiance used IG's monopoly over local distribution to leverage increased sales of natural gas and transportation to customers in the relevant market, and second, that IG has denied the plaintiffs access to an essential facility, *i.e.*, an interconnect with IG's distribution system. These claims are brought, in a belt-and-suspenders approach, as both ac-

tual and attempted monopolization claims. It is not necessary to determine whether the monopolies the plaintiffs complain of are actual or not, since either way their amended complaint fails to adequately make out the claims.

The plaintiffs' monopoly leveraging claim is essentially their tying claim with a different label. This is problematic because a § 2 claim can only accuse one firm of being a monopolist, but the plaintiffs' monopoly maintenance claim involves both IG's monopoly over the sale of gas and its distribution within its territory via ProLiance. Because IG ceded its gas marketing functions to ProLiance as part of the joint venture, the plaintiffs claim that IG has monopoly control over something in which it is not a market participant. The plaintiffs claim that ProLiance is functionally under the control of IG, but as we explained when discussing the plaintiffs' § 1 claims concerning ProLiance's formation, ProLiance is an entity separate and distinct from IG, so the plaintiffs' leveraging claims should be considered under § 1 of the Sherman Act, not § 2. In any event, as we concluded regarding plaintiffs' tying claims, this claim fails because the plaintiffs are unable to establish that they have suffered an antitrust injury, so the district court properly dismissed this claim.

The essential facilities claim centers on the proposed interconnect between Storage's field and the IG distribution network, which the plaintiffs describe as necessary for the storage field to service clients within IG's territory. An essential facilities claim requires that the plaintiff allege: (1) that Indiana Gas is a monopolist and controls an essential facility; (2) that the facility could have been provided to Storage by Indiana Gas; (3) that Indiana Gas denied access to the essential facility; and (4) that a duplicate facility could not reasonably be provided. *See MCI Communications Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1133 (7th Cir. 1983). The plaintiffs describe the in-

terconnect between the storage field and the IG distribution network as the facility at issue, but "[t]o be an essential facility, . . . a facility must be essential," and the interconnect is not. *Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1413 (7th Cir. 1995). According to the amended complaint, the storage field is already connected to interstate gas pipelines, including those of PEPL, TGT and a third company called ANR. Just as gas can be routed into the storage field via these three pipelines, so can gas be routed *out* of the field via these pipelines, and from there to IG's distribution network through the pipeline's own interconnect.

Though the plaintiffs say, probably correctly, that "[a] direct interconnect to the Indiana Gas pipeline from Storage's field would have been the most economical way to do this," the most economical route is not an essential facility when other routes are available. *See Endsley v. City of Chicago*, 230 F.3d 276, 283 (7th Cir. 2000) (control of the Chicago Skyway does not give its owner a monopoly over road transport between Chicago and Indiana when other freeway and surface street routes are available). Therefore, the § 2 claims in the amended complaint were properly dismissed by the district court.

The plaintiffs also allege in the amended complaint that PEPL and IG conspired to prevent Storage from being able to serve as an alternative route or shortcut between pipeline systems by frustrating Storage's attempt to have the field designated as a secondary delivery point on PEPL's pipeline. This is not a § 2 claim, and is addressed above in our discussion of the plaintiffs' § 1 conspiracy claim.

E.  State Law Claims

The plaintiffs allege, pursuant to Indiana state law, that the defendants committed the tort of interference with

prospective economic advantage and violated the Indiana Antitrust Act, Ind. Code §§ 24-1-2-1, *et seq*. As the district court and both sides recognize, the Indiana Antitrust Act follows the same standards as the Sherman Act. *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 725 n.31 (7th Cir. 1979); *Citizens Nat'l Bank of Grant Cty. v. First Nat'l Bank in Marion*, 331 N.E.2d 471, 478 n.5 (Ind. Ct. App. 1975). Based on our conclusions regarding the plaintiffs' federal antitrust claims, we find that the district court improperly dismissed those state antitrust claims which relate to the federal claims that we have found were adequately pleaded, *i.e*, Storage's § 1 conspiracy claim.

The plaintiffs' other state law claim is for tortious interference with a prospective economic advantage. Under Indiana law, this claim requires: (1) the existence of a business relationship, (2) the defendant's knowledge of the existence of that relationship, (3) the defendant's intentional interference in that relationship, (4) the absence of any justification, and (5) damages. *See Wright v. Associated Ins. Cos. Inc.*, 29 F.3d 1244, 1252 (7th Cir. 1994); s*ee also Flintridge Station Assocs. v. Am. Fletcher Mortg. Co.*,761 F.2d 434, 441 (7th Cir. 1985); *Butts v. Oce-USA, Inc.*, 9 F. Supp. 2d 1007, 1012 (S.D. Ind. 1998); *Furno v. Citizens Ins. Co. of Am.*, 590 N.E.2d 1137, 1140 (Ind. Ct. App. 1992).

The district court, in its January 8, 2001, entry on Indiana Gas's Motion to Correct Errors in Judgment, found that IG was a party to the business relationship that was disrupted and dismissed the claim. However, when judging the sufficiency of a complaint on a motion to dismiss, a claim should be dismissed only "if it appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle it to relief." *Tobin for Governor v. Ill. State Bd. of Elections*, 268 F.3d 517, 522 (7th Cir. 2001); *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

It is just as plausible that the business relationship allegedly disrupted was Services's relationship with its end-use customers located in IG's service area. Services was required to notify IG that it had established a gas supply contract with the end users. According to the amended complaint, IG then contacted those customers itself and informed them of ProLiance's services. If these contacts resulted in customers backing out of their relationships with Services and working instead with ProLiance, that would establish a claim of interference with prospective economic advantage sufficient to survive a motion to dismiss. Since the set of facts described above is consistent with the allegations in the complaint and would entitle Services to relief if true, we find that the district court improperly dismissed this claim regarding Services. *See Lanigan v. Village of East Hazel Crest, Ill.*, 110 F.3d 467, 479 (7th Cir. 1997).

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the decision of the district court in part, REVERSE in part, and REMAND for proceedings consistent with this opinion.

A true Copy:

  Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*