# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
February 1, 2022

Lyle W. Cayce
Clerk

No. 21-30294

Residents of Gordon Plaza, Inc.,

*Plaintiff—Appellant*,

*versus*

LaToya Cantrell, *in her official Capacity as Mayor of the City of New Orleans*; City of New Orleans,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:20-CV-1461

Before Owen, *Chief Judge*, and Clement and Engelhardt, *Circuit Judges*.

Edith Brown Clement, *Circuit Judge*:

Appellant, the Residents of Gordon Plaza, Inc. ("Gordon Plaza"), appeals the dismissal with prejudice of its complaint, filed under the citizen-suit provision of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6972(a)(1)(B), against the Appellees—LaToya Cantrell, in her official capacity as Mayor of the City of New Orleans, and the City of New Orleans (collectively, the "City").

For the reasons that follow, we AFFIRM.

No. 21-30294

## I.

### A.

Gordon Plaza is an association of primarily African American residents of a neighborhood called Gordon Plaza located on the site of the Agriculture Street Landfill ("Site") that the City previously owned and operated. Because of this previous use, the Site allegedly contains significant levels of hazardous chemicals and solid waste. Approximately twenty years after the City ceased using the Site as a landfill, it developed the Site for residential use. The City is alleged to have targeted Black residents in selling the residential units and without disclosing that the Site had previously been used as a landfill.

In 1994, the Environmental Protection Agency ("EPA") listed the Site as a Superfund site on the National Priorities List ("NPL") based on concerns about arsenic, lead, and polynuclear aromatic hydrocarbon levels. From 1994 to 2001, the EPA fenced off part of the Site, removed two feet of soil in some areas, placed a permeable "geotextile mat" over some contaminated soils, and covered some contaminated soils with about a foot of soil. In 2002, the EPA announced it had "completed all response actions for the Agriculture Street Landfill site in accordance with Close Out Procedures for National Priorities List Sites."

In 2005, Hurricane Katrina devastated New Orleans. The complaint alleges that, after the storm, the U.S. Agency for Toxic Substances and Disease Registry (a federal public health agency of the U.S. Department of Health and Human Services) concluded that chemical concentrations at the Site "pose[d] an indeterminate public health hazard." And in 2018, the EPA determined that the soil on nine residential properties on the Site "may contain contaminant levels that are unacceptable for non-industrial use." Gordon Plaza alleges that, because of soil erosion caused by storms and the

passing of time, the geotextile mat is exposed in some places and missing in others, releasing contaminated soil.

In 2008, the EPA and the City reached a Superfund consent decree ("Consent Decree" or "Decree") requiring the City to take certain actions to "protect the remedy" that the EPA installed at the Site, and "thereby, [protect] the public health or welfare or the environment at the Site." The "remedy" is defined as "the excavation of 24 inches of soil, placement of a permeable geotextile mat/marker on the subgrade, backfilling the excavated area with clean fill, covering the clean fill with grass sod, landscaping and yard restoration, driveway and sidewalk replacement, and final detailing." Because the "soil cap and geotextile mat covering the Site could be breached or degraded by excavation . . . or by the failure to maintain the vegetative cover over the soil cap," the Decree requires the City "to maintain the [soil] cap" at the Site. Specifically:

> The [City] will mow vegetation at least twice per year, and otherwise maintain[] its right of ways . . . in order to maintain a stable vegetative cover. Because lack of mowing/maintenance by private owners of land within the Site is likely to damage the subsurface geotextile mat, the City will use its available authorities to (a) require that landowners mow and otherwise maintain the grass vegetation on their properties, or (b) undertake the necessary maintenance directly.

The City must also "refrain from using the Site . . . in any manner that would interfere with or adversely affect the implementation, integrity, or protectiveness of the remedy."

The Decree also required the City to provide a Technical Abstract—a protocol for utility providers to "follow to maintain the integrity of the permeable soil and geotextile mat" with instructions on how to properly excavate beneath the geotextile mat, if necessary—to all utilities operating within the Site, and to "direct that all of its agencies and

departments . . . incorporate the Technical Abstract . . . as standard operating procedures when working within the Site."

Among its other commitments under the Consent Decree, the City was required to "designate an official of the City as the Project Coordinator who will be responsible for ensuring the City's compliance with the requirements of the Decree" and who "shall be the lead point of contact for EPA with the City." The City "shall submit to EPA on an annual basis . . . a written progress report that describes the actions which have been taken to achieve compliance." And the Decree additionally provides for EPA oversight, including access for "5-year reviews," for "[m]onitoring, investigation, removal, remedial or other activities at the Site," as well as for "[a]ssessing [the City's] compliance with [the] Consent Decree."

The EPA's most recent five-year review report was issued in 2018 ("2018 Five-Year Review Report") and comprises 31 pages of EPA findings and 321 pages of attachments and appendices. The Report concluded that the City was in compliance with the Consent Decree. Specifically, the Report stated that the "soil barrier that covers the entire site is in place and expected to remain in place over time, restricting exposure to the remaining subsurface contaminants associated with the site."

## B.

On May 15, 2020, Gordon Plaza brought this citizen suit under RCRA, § 6972(a)(1)(B), alleging that the Site remains contaminated with hazardous chemicals causing residents to suffer from cancer and other health conditions. Gordon Plaza seeks a declaration of imminent and substantial endangerment and an order that the City perform an environmental quality analysis, risk assessment, and full abatement of the Site. The complaint failed to inform the district court of the 2008 Consent Decree between the City and the EPA.

No. 21-30294

The City attached the Decree to its responsive pleadings and moved to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that the suit was precluded by RCRA's statutory bar on citizen suits where a "responsible party is diligently conducting a removal action" pursuant to a consent decree with the EPA. *See* 42 U.S.C. § 6972(b)(2)(B)(iv); *see also* Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601(23) (providing statutory definition of "removal" action). The district court took judicial notice of the Consent Decree and granted dismissal with prejudice based on its finding that the Decree "requires the City to perform removal actions on an ongoing basis" and that Gordon Plaza "fail[ed] to plausibly allege that the City's continued actions under the consent decree are not 'removal actions.'"

Gordon Plaza moved the court to reconsider its final order under Rule 59(e). *See* Fed. R. Civ. P. 59(e). The district court denied the motion. Gordon Plaza timely appealed.

We note that the instant lawsuit presents Gordon Plaza's second time at bat on these claims—which it failed to properly inform the district court about as required by the local rules. *See* E.D. La. L.R. 3.1. In April 2018, Gordon Plaza filed a RCRA citizen suit against the City, seeking the relocation of its members ("2018 Litigation"). The suit was dismissed without prejudice for lack of standing. *Residents of Gordon Plaza, Inc. v. Cantrell* (*Gordon Plaza I*), No. 18-4226, 2019 WL 2330450, at *2–3 (E.D. La. May 31, 2019).[1] Gordon Plaza's motion to amend the complaint was denied

---

[1] The *Gordon Plaza I* court offered its view in dicta that the 2008 Consent Decree did not trigger RCRA's statutory bar against citizen suits. 2019 WL 2330450, at *3–4. The court found that the City's obligations, such as "maintaining a stable vegetative cover, involve basic maintenance of completed removal actions" and are not, themselves, removal actions. *Id.* at *3. The court cited no authority for this holding. Because the district court's

upon the district court's finding that Gordon Plaza had acted with "bad faith or dilatory motive" because, in part, its "theories of recovery [were] intentionally advanced in a piecemeal or disjointed fashion."

On appeal, Gordon Plaza argues three grounds for reversal. First, that the district court abused its discretion by relying on the City's diligent-removal-action defense, which Gordon Plaza contends was improperly asserted in a reply brief. Second, that the district court erred in finding that the City has been diligently engaged in a removal action.[2] And third, that the district court abused its discretion by denying leave to amend.

## II.

We review *de novo* the grant of a motion to dismiss under Rule 12(b)(6). *See Meador v. Apple, Inc.*, 911 F.3d 260, 264 (5th Cir. 2018). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* We accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *See Kelson v. Clark*, 1 F.4th 411, 416 (5th Cir. 2021).

---

discussion of the citizen-suit statutory bar takes place in dicta and in a separate civil action seeking distinct relief, it was not the law of the case in the underlying proceedings. *See Med. Ctr. Pharmacy v. Holder*, 634 F.3d 830, 834 (5th Cir. 2011) (law of the case doctrine "govern[s] the same issue in subsequent stages *in the same case*" (emphasis added)).

[2] Gordon Plaza disputed the district court's taking judicial notice of the 2008 Consent Decree and the 2018 Five-Year Review Report. It has waived that issue on appeal.

No. 21-30294

### III.

Gordon Plaza sets forth three arguments to challenge the district court's dismissal of the complaint under RCRA's statutory bar, which provides that citizen suits may not be commenced where a "responsible party is diligently conducting a removal action" pursuant to a consent decree with the EPA.  42 U.S.C. § 6972(b)(2)(B)(iv).  First, that the district court abused its discretion by considering whether the City's actions under the Consent Decree are removal actions because, according to Gordon Plaza, the City raised this defense in a reply brief.  Second, that the court erroneously determined the City's actions under the Decree are "removal" actions.  And third, that the court erred when it found the City has been "diligently" performing those actions.

### A.

We begin with the threshold issue whether the City first asserted in a reply brief its defense that its actions under the Consent Decree constituted "removal" actions.  In the Fifth Circuit, a district court abuses its discretion when it considers new arguments raised for the first time in a reply brief without providing the "non-movant an adequate opportunity to respond prior to a ruling." *Thompson v. Dall. City Att'y's Off.*, 913 F.3d 464, 471 (5th Cir. 2019) (quoting *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 (5th Cir. 2004)). Gordon Plaza contends that "[n]either the City nor the District Court identified any instance in which the City claimed—before that reply—to have conducted a 'removal action,' whether in the case under appeal or in the preceding case."

The City first asserted its defense that the Consent Decree with the EPA barred citizen suits under RCRA in the 2018 Litigation, and the court identified "[t]he question before [it] [as] whether defendants are . . . 'diligently conducting a removal activity' as required to preclude a

7

citizen suit." *Gordon Plaza I*, 2019 WL 2330450, at *3 (quoting 42 U.S.C. § 6972(b)(2)(B)(iv)). The City stated that it was "asserting these same grounds for dismissal" in its motion to dismiss in the proceedings below. The City further explained that "Gordon Plaza's citizen suit is barred by the RCRA since the EPA has been proceeding with a removal action . . . and has entered a Consent Decree with the City . . . in 2008 which has extended additional remediation and with which the City is in compliance." In asserting that Gordon Plaza's suit was statutorily barred, the City cited 42 U.S.C. § 6972(b)(2)(B)(iv). Notably, in its opposition to the motion to dismiss, Gordon Plaza recognized that "Section 6972(b)(2)(B)(iv) would only apply . . . if—in the present tense—'a responsible party [*e.g.*, the City] *is* diligently conducting a removal action,'" and argued that "[n]either EPA nor any other party . . . is actually engaging in a removal action because the agency finished the removal actions."

Because we find that the City raised its defense under 42 U.S.C. § 6972(b)(2)(B)(iv) in both the 2018 Litigation and in its motion to dismiss in the instant suit, we hold that the district court did not abuse its discretion by considering it.

## B.

We turn next to Gordon Plaza's contention that this citizen suit is not barred because the City's obligations under the 2008 Consent Decree are not "removal" actions. Gordon Plaza sets forth two arguments. First, that we should accord deference to an EPA statement in the preamble to a proposed rule, which, according to Gordon Plaza, represents the EPA's authoritative interpretation of "removal" to exclude "operation and maintenance" activities. Second, that the City's activities under the Consent Decree do not fall within the statutory definition of a "removal" action. Neither contention has merit.

**1.**

We turn first to the issue whether the EPA has provided an authoritative interpretation of "removal" to which we should accord deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), or, in the alternative, a persuasive interpretation under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). We find that deference is not appropriate under either framework.

When reviewing an agency's legal construction of the statute that it administers, we apply the two-step analysis established by the Supreme Court in *Chevron*. *See* 467 U.S. at 842–44. But before leaping into the *Chevron* two-step, we must determine whether the agency construction is of a form that warrants application of the framework at all. The Supreme Court has instructed federal courts not to reach *Chevron* steps one or two *unless* the court first determines "the agency interpretation claiming deference was promulgated in the exercise of that authority" to make rules carrying the force of law. *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001); *see also Dhuka v. Holder*, 716 F.3d 149, 155 (5th Cir. 2013) (noting the "predicate requirement that the agency have issued its interpretation in a manner that gives it the force of law"). We refer to this threshold inquiry as "*Chevron* step zero." *See Ali v. Barr*, 951 F.3d 275, 279 (5th Cir. 2020) (citing Cass R. Sunstein, Chevron *Step Zero*, 92 Va. L. Rev. 187, 191 (2006)).

Gordon Plaza argues that the "EPA has spoken directly to the issue" before us in a *proposed* rule—specifically, the EPA's 2002 proposal to delete a particular Superfund site from the NPL. *See* EPA, *Notice of Intent to Delete the Del Norte County Pesticide Storage Area Superfund Site from the National Priorities List*, 67 Fed. Reg. 51,528 (Aug. 8, 2002). Gordon Plaza points to one sentence in the *preamble* to that proposed rule: The "CERCLA . . . defines response as removal and remedial actions, and does

not include operation and maintenance activities." *Id.* According to Gordon Plaza, this sentence presents the EPA's "legal conclusion" that "removal" action excludes "operation and maintenance."

Notably, the proposed rule does not indicate an intention to clarify rights and obligations generally with the force of law but rather to set out a fact-bound inquiry into the application of a regulation to a particular party—here, the provision for NPL site deletion in the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R. § 300.425(e). *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); *see also Mead*, 533 U.S. at 226. And the specific language at issue does not purport to provide an agency position on the statutory definition of a "removal" action but to parrot Congress's existing definition for a "response" action. In any event, we have long held that "proposed regulations are entitled to no deference until final." *Howard Hughes Co. v. Comm'r*, 805 F.3d 175, 185 (5th Cir. 2015) (quoting *In re Appletree Mkts., Inc.*, 19 F.3d 969, 973 (5th Cir. 1994)). This is, in part, because "a proposed regulation does not represent an agency's considered interpretation of its statute." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845 (1986). And that logic is at play here where the purported legal conclusion from the preamble of the proposed rule fails to materialize in the finalized rule.

The final rule following the proposed rule consists of one sentence: "Table 1 of appendix B to part 300 is amended by removing the entry for" the particular site at issue. EPA, *Notice of Deletion for the Del Norte County Pesticide Storage Area Superfund Site from the National Priorities List*, 67 Fed. Reg. 58,731 (Sept. 18, 2002). The introductory summary of the final rule includes a notably distinct version of the language at issue: "The EPA and the State of California . . . have determined that all appropriate response actions under CERCLA, *other than* Operation and Maintenance and Five-Year reviews, have been completed." *Id.* (emphasis added). The addition of

the phrase "other than" appears to undermine Gordon Plaza's position by suggesting that operation and maintenance activities *are* included within the scope of response activities.

Gordon Plaza persists that the EPA implicitly implemented an interpretation of "removal" that excludes operation and maintenance activities because the NCP only allows for sites to be deleted from the NPL "where no further response is appropriate," 40 C.F.R. § 300.425(e), and "response" is defined to include "removal," 42 U.S.C. § 9601(25). But obvious separation-of-powers principles prevent us from deferring to language in the preamble of a proposed regulation that the EPA declined to include in its final rule, which itself only purported to provide an individual, ad hoc determination. *Appletree Mkts.*, 19 F.3d at 973. *Cf. Kaufman v. Nielsen*, 896 F.3d 475, 484–85 (D.C. Cir. 2018) (declining to accord *Chevron* deference to agency letter "singularly focused" on the application of a regulation to one individual and not "clearly intended to have general applicability and the force of law" (citation omitted)).

Because the language in the proposed rule does not provide an interpretation of "removal" carrying the force of law, it fails to pass *Chevron* step zero and we do not accord deference under that framework.

Gordon Plaza argues that the language in the proposed rule is at least entitled to *Skidmore* deference, which applies to "agency interpretations of statutes they administer that do not carry the force of law." *Luminant Generation Co. v. EPA*, 675 F.3d 917, 928 (5th Cir. 2012). *Skidmore* deference follows from the understanding that agency constructions, even where not authoritative, are entitled to respect insofar as they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore*, 323 U.S. at 140. However, with the deferential thumb removed from the scale, only the "well-reasoned views of

the agencies implementing a statute" warrant respect. *Mead*, 533 U.S. at 227 (quoting *Bragdon v. Abbott*, 524 U.S. 624, 642 (1998)). The weight provided to the agency's interpretation "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore*, 323 U.S. at 140.

The EPA's proposed rule lacks the necessary markers of persuasion. This statement about the statutory definition of "response" does not purport to interpret an ambiguous provision of CERCLA, and does not meaningfully set forward as the subject of notice-and-comment rulemaking the interpretation of an ambiguous statute. Rather, the language at issue is housed in the preamble of a proposed rule that purports to call for comment on the ad hoc deletion of a site from the NPL. The proposed rule is devoid of statutory interpretation or discussion. Its language does not indicate intent to provide a generally applicable interpretation of "removal." The sentence at issue—language that was not adopted in the final rule—lacks the hallmarks of persuasion and is not entitled to *Skidmore* deference.

We hold that neither *Chevron* nor *Skidmore* deference is warranted.

**2.**

Gordon Plaza asserts that CERCLA's definition of "removal" does not encompass the City's obligations under the Consent Decree. The classification of a "removal" action is a question of law. *United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1234 (9th Cir. 2005).

The Consent Decree refers to the City's obligations as "proper operation and maintenance practices and institutional controls." The parties agree that the City's activities are "maintenance" actions. The essence of their dispute is whether the City's maintenance actions fall within the scope of "removal" actions under CERCLA.

The Decree provides that, "[u]nless otherwise expressly provided," terms used in the Decree adopt the definition provided in CERCLA or in regulations promulgated thereunder. The Decree does not define "removal action" or "operation and maintenance practices." CERCLA does not provide definitions for the terms "operation" or "maintenance" but defines the term "removal" as:

> The cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, [and] temporary evacuation and housing of threatened individuals not otherwise provided for . . . .

42 U.S.C. § 9601(23). We have recognized that "Congress intended that the term 'removal action' be given a broad interpretation." *Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 926 (5th Cir. 2000) (quoting *Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836, 843 (6th Cir. 1994)), *abrogated on other grounds as recognized by Vine Street LLC v. Borg Warner Corp.*, 776 F.3d 312, 317 (5th Cir. 2015); *see also United States v. Lowe*, 118 F.3d 399, 402 (5th Cir. 1997) (noting the term is "defined broadly"). The definition of removal encompasses more than the "cleanup . . . of released hazardous substances from the environment"; it also covers the "monitor[ing], assess[ing], and evaluat[ion of] the . . . threat of release of hazardous substances" and the catchall "taking of such other actions . . . to prevent, minimize, or mitigate

damage . . ., which may otherwise result from a . . . threat of release" of hazardous substances.  § 9601(23).  Accordingly, we have observed that removal is "aimed at *containing and* cleaning up hazardous substance releases." *Lowe*, 118 F.3d at 403 (emphasis added).  And this understanding is reflected in the NCP, which lists examples that, "as a general rule," fall within the scope of a removal action, including the "[c]ontainment . . . of hazardous materials—where needed to reduce the likelihood of human, animal, or food chain exposure."  40 C.F.R. § 300.415(e)(8).

The definition of "removal" action encompasses the City's ongoing obligations under the Consent Decree.  The Decree states its objective is to task the City with fulfilling certain obligations in order to "protect the [EPA's] remedy on the Site and, thereby, the public health or welfare or the environment at the Site."  In parallel language, "removal" broadly includes the "taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment." 42 U.S.C. § 9601(23).

The Decree specifically requires the City to "maintain a stable vegetative cover."  The vegetative cover prevents erosion of the soil cap and geotextile mat.  And "failure to maintain the vegetative cover" risks that the soil cap and geotextile mat will be "breached or degraded."   The EPA installed the soil cap and geotextile mat to protect against "the release or threatened release of hazardous substances at the [Site]."   "Because contaminants have been left in place beneath the geotextile mat," and "[b]ecause [the] lack of mowing/maintenance . . . is likely to damage the subsurface geotextile mat," "proper operation and maintenance practices and institutional controls are required to maintain the integrity of the cap." Accordingly, the City is obligated to mow vegetation "at least twice per year" and to "use its available authorities to (a) require that landowners otherwise maintain the grass vegetation on their properties, or (b) undertake the

necessary maintenance directly." The City was also required to pass an ordinance requiring property owners to notify the City if they intend to excavate soil beneath the geotextile mat, and to "direct that all of its agencies and departments" incorporate the Technical Abstract as standard operating procedure within the Site.

In sum, the City must maintain the vegetative cover, which protects the integrity of the geotextile mat, and thereby prevents the contaminants underneath from being released. This obligation easily falls within the definition of a "removal" action to include "the taking of such [ ] actions as may be necessary to prevent, minimize, or mitigate damage . . . , which may otherwise result from a release or threat of release." 42 U.S.C. § 9601(23).

Gordon Plaza wholly fails to engage with the statutory text, except to point out that the definition of "removal" does not explicitly include the terms "operation and maintenance." Gordon Plaza then points to EPA guidance and regulations, terminology in the 2008 Consent Decree and 2018 Five-Year Review, and dicta in our precedent—all of which Gordon Plaza alleges contradicts our reading of the statutory definition of "removal."

First, Gordon Plaza cites to language in an EPA regulation defining "[o]peration and maintenance" as "measures required to maintain the effectiveness of response actions," and separately defining "[r]espond or response" as "remove, removal, remedy, or remedial action, including enforcement activities related thereto." 40 C.F.R. § 300.5. But neither definition informs the definition of "removal" nor whether "removal" actions exclude "[o]peration and maintenance." Similarly, Gordon Plaza's citation to the NCP's provision that operation and maintenance measures "are initiated after the remedy has achieved the remedial action objectives" is not helpful because CERCLA separately defines "remedy" and "removal." *See* 40 C.F.R. § 300.435(f)(1); 42 U.S.C. § 9601(23), (24).

Second, Gordon Plaza points to EPA Superfund guidance separately discussing removal actions and "post-removal site controls" ("PRSCs"). *See* EPA, *Superfund Removal Procedures: The Removal Response Decision, Site Discovery to Response Decision*, p. 8 (June 1998). But this guidance is not illuminating because the EPA defines PRSCs as "those activities that are necessary to sustain the integrity of a [ ] removal action following its conclusion" and concludes that a PRSC "may be a removal . . . action under CERCLA." 400 C.F.R. § 300.5.

Third, Gordon Plaza argues that the language in the Decree and the 2018 Five-Year Review Report reflect that the EPA does not consider the City's activities to be "removal" actions but "Post-Removal Activities" and "maintenance and protect[ion]" actions. But we have already explained that the City's "maintenance" of the vegetative cover and "protection" of the geotextile mat falls within the statutory definition of a "removal" action.

Finally, Gordon Plaza cites to dicta in our precedent that "a 'removal' is generally understood to be a short-term response." *Lowe*, 118 F.3d at 402. This generality arises from caselaw distinguishing the statutory definitions of "removal" and "remedial" actions. *E.g.*, *Voluntary Purchasing Grps., Inc. v. Reilly*, 889 F.2d 1380, 1382 n.4 (5th Cir. 1989). Whether removal actions are *generally* short- or long-term by comparison to remedial actions does not determine the specific question before us. *Cf. W.R. Grace & Co.*, 429 F.3d at 1244 (rejecting that removal actions *must* be short-term); *Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 934 (6th Cir. 2004) (same).

In short, Gordon Plaza has failed to point to authority clearly interpreting "removal" to exclude operation and maintenance activities. We hold that the City's maintenance obligations under the Decree are "removal" actions under CERCLA.

## C.

We turn next to Gordon Plaza's contention that the City was not "diligently" conducting a removal action. We hold that Gordon Plaza has failed to plausibly plead this allegation.

At the threshold, we note that the Consent Decree provides a framework for ongoing monitoring of the City's performance of its obligations under the Decree. Specifically, the Decree provides for annual reporting, EPA oversight and 5-year review inspections, stipulated penalties if the City is found in noncompliance with its provisions, and dispute resolution culminating in court. We take note of these regular reporting and inspection requirements because RCRA's statutory bar on citizen suits is "intended to avert citizen suit interference with state and federal enforcement activities." *Chico Serv. Station, Inc. v. Sol P.R. Ltd.*, 633 F.3d 20, 28 (1st Cir. 2011). We observed in the context of the Clean Water Act— which we have found "requires like interpretation" to the citizen-suit provisions of RCRA, *Cox v. City of Dallas*, 256 F.3d 281, 308 (5th Cir. 2001)—that "the citizens' role in enforcing the Act is 'interstitial' and should not be 'intrusive,'" *La. Env't Action Network v. City of Baton Rouge*, 677 F.3d 737, 740 (5th Cir. 2012) (per curiam) (quoting *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 61 (1987)). Here, Gordon Plaza's complaint addresses the same environmental concerns as the Consent Decree. *Cf. A-C Reorg. Tr. v. E.I. DuPont de Nemours & Co.*, 968 F. Supp. 423, 430–31 (E.D. Wis. 1997) (finding RCRA citizen-suit not barred by consent order where plaintiff's claims went beyond consent order).

The district court found that "[n]othing in the complaint indicates that the City fails to comply with the consent decree, or that the City is not diligently conducting a removal action in abiding by the consent decree." The complaint does not allege that the City is in violation of the Decree. It

alleges that "no responsible party is diligently conducting a removal action" without any factual allegations in support. In an attachment to the complaint, Gordon Plaza included a photo of a person lifting a tarp on the ground next to a fenced off area of vegetation. The photo is dated May 10, 2016, and captioned: "Exposed geotextile mat (indicating the interface between fill and contaminated soil)." Gordon Plaza also points to a statement from the EPA's 2018 Five-Year Review Report (which was attached to the City's responsive pleadings): "The City reports quarterly grass cutting . . ., however, during the site inspection, heavily overgrown vegetation . . . was observed."

Gordon Plaza argues that it has thus plausibly alleged "deficient performance [ ] not adher[ing] to the actions ordered by the Decree." We disagree. The photo attached to Gordon Plaza's complaint is dated to 2016. Gordon Plaza concedes that the EPA has since reviewed the Site—in 2018— and found the City in compliance with the Consent Decree. Specifically, that the "soil barrier that covers the entire site is in place and expected to remain in place over time, restricting exposure to the remaining subsurface contaminants associated with the site." And that the City was mowing the vegetation more frequently than required. The EPA did not record exposed geotextile mat. The note of "overgrown vegetation" did not prevent the EPA's finding the City in compliance with the Decree.

"Factual allegations must be enough to raise a right to relief above the speculative level." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)). Here, the complaint relies on a single conclusory statement and a photo predating the EPA's conclusion that the City is in compliance with the Consent

Decree. We hold that Gordon Plaza has failed to plausibly allege that the City is not diligently performing a removal action.[3]

## IV.

Finally, Gordon Plaza contends the lower court improperly dismissed the complaint without leave to amend. We disagree.

"Whether leave to amend should be granted is entrusted to the sound discretion of the district court, and that court's ruling is reversible only for an abuse of discretion." *Heinze v. Tesco Corp.*, 971 F.3d 475, 485 (5th Cir. 2020) (quoting *Pervasive Software Inc. v. Lexware GmbH*, 688 F.3d 214, 232 (5th Cir. 2012)). But a district court may only deny leave "for a substantial reason, such as undue delay, repeated failures to cure deficiencies, undue prejudice, or futility." *Stevens v. St. Tammany Par. Gov't*, 17 F.4th 563, 575 (5th Cir. 2021) (quoting *U.S. ex rel. Spicer v. Westbrook*, 751 F.3d 354, 367 (5th Cir. 2014)). Absent such factors, leave to amend should be "freely given." Fed. R. Civ. P. 15(a).

The district court denied Gordon Plaza's second attempt to plead its claims based on its findings of undue delay, bad faith or dilatory motive, repeated failures to cure deficiencies, and undue prejudice to the City. The

---

[3] Gordon Plaza also argues that the issue of "diligence" is a question of fact that cannot be determined at the motion to dismiss stage. We disagree. We have explicitly declined to determine whether "diligence" is "a fact-intensive question that can only be answered after the proper development of a record." *See La. Env't Action Network*, 677 F.3d at 750 (considering the diligent-prosecution bar on citizen-suits under the Clean Water Act, 33 U.S.C. § 1365(b)(1)(B)). Gordon Plaza points to our holding in *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, where we found that "diligence" under § 6972(b)(2)(B) "is a fact issue [ ] that the complainants cannot be expected to prove[] at the pleading stage." 849 F.2d 1568, 1574 (5th Cir. 1988). But *Tanglewood* did not involve a consent decree binding the responsible party's conduct, government oversight, reporting requirements, and site examinations; nor did it provide for penalties and dispute resolution in the case of a violation of the consent decree. We find those differences persuasive here.

court explained that the 2018 Litigation and the City's responsive pleading in the instant suit placed Gordon Plaza on notice of the materiality of the issue whether the City was diligently engaged in a removal action and the statutory bar under § 6972(b)(2)(B)(iv). Thus the court found the request for leave to amend unduly delayed and in bad faith.

As discussed, the City properly raised its defense under RCRA's statutory bar in both its responsive pleading and in the 2018 Litigation. Yet, Gordon Plaza failed to timely amend its pleadings and further failed to indicate with any particularity the factual allegations with which it proposes to amend its complaint. Indeed, Gordon Plaza implied in its briefing before us that it cannot provide more detailed allegations "without the benefit of discovery." Based on Gordon Plaza's repeated failure to cure its pleadings and lack of diligence to present any indication of the factual allegations with which it seeks to amend its complaint, we hold that the district court did not abuse its discretion in denying leave to amend.

*    *    *

We AFFIRM.